739 So.2d 262 (1999)
Marie ALEXANDER
v.
CITY OF BATON ROUGE and Parish of East Baton Rouge.
No. 98 CA 1293.
Court of Appeal of Louisiana, First Circuit.
June 25, 1999.
*264 C. Glenn Westmoreland, Rome and Westmoreland, Livingston, for Plaintiff-Appellee Marle Alexander.
Randy B. Ligh, Baton Rouge, for Defendant-Appellant City of Baton Rouge/Parish of East Baton Rouge.
Before: LeBLANC, FOGG, and PARRO, JJ.
PARRO, J.
The consolidated government of the City of Baton Rouge and Parish of East Baton Rouge (the city/parish) appeals the trial court's award of damages to Marie Alexander, who injured her face and teeth when she walked into a "No Parking" sign in broad daylight. The trial court found that, because of its location, the sign presented an unreasonable risk of harm. Our review of the record convinces us that this finding was manifestly erroneous, and we reverse.

FACTUAL BACKGROUND
On February 1, 1995, Ms. Alexander was walking with her daughter from the Belle of Baton Rouge, where they had gone to pick up an employment application for her daughter. It was about one o'clock in the afternoon on a bright day, and the two were retracing the route they had taken earlier. The sidewalk on the south side of France Street was closed for some construction work, so they were walking in an easterly direction along the north side of the street, proceeding away from the riverboat and toward the parking lot where they had left their car. To get to that lot, they had to cross France Street, and they were heading for a crosswalk that was clearly marked with "zebra" striping.
The sidewalk and street in this historic "Catfish Town" section of Baton Rouge are constructed of brick pavers to resemble cobblestone, so the surface is not completely smooth. The sidewalk is about seven and one-half feet wide, and on the north side of France Street, there is no curb between the sidewalk and the street. Instead, the sidewalk is separated from the street by a series of four-inch by four-inch wooden posts, each about thirty inches high, set about five feet apart along the length of France Street. At several intervals, in place of these short posts, there are taller posts about ninety inches high, on which traffic signs are mounted. One of these posts, with a "No Parking Any Time" sign affixed to it, was located right at the west edge of the crosswalk. The sign was twelve inches wide, so it protruded from either side of the post about four inches.[1] The bottom of the sign was at a height of fifty-seven and three quarter inches from the pavers.
Ms. Alexander testified that she and her daughter were walking near the center of the sidewalk. She was keeping her head down, watching where she put her feet, so she would not trip on the uneven sidewalk surface. As they approached the crosswalk, they had to move together and to their right, closer to the street, to avoid a group of oncoming pedestrians heading toward the riverboat. At this moment, Ms. Alexander saw the taller post on her right and reached out her hand to steady herself on the post as she turned onto the crosswalk. Ms. Alexander said, "[A]nd I was a step into the sign when I saw it. Well, I *265 couldn't stop. It was, whammy." She walked right into the back side of the sign, hitting her face.
The impact broke her glasses and cut a gash across the bridge of her nose. She also had a severe nosebleed, which eventually stopped. Ms. Alexander later learned that the blow resulted in a deviated septum. Her mouth was also hurting after the accident, and she feared she had damaged a tooth implant that had just been in place about a week. In fact, when she visited her dentist, he determined that she had broken both eyeteeth. When the accident occurred, she was wearing a partial bridge in place of her two front teeth; this temporary "flipper" was attached to the eyeteeth, and was broken in three pieces when she hit the sign. Because of the damage to her eyeteeth, extensive additional dental work was necessary and at the time of trial, she was still having problems with her teeth and the additional bridge work.
Michael Joseph Frenzel, a safety expert, stated on behalf of Ms. Alexander that the traffic sign was obviously too low, such that it would be an obstruction to normal pedestrian passage. He referred to the Uniform Traffic Control Devices Manual, which stated that in business, commercial, and residential districts where parking and/or pedestrian movement is likely to occur, the clearance to the bottom of any traffic control sign should be at least seven feet. Mr. Frenzel said the risk was increased because of this sign's placement on the edge of the crosswalk, where pedestrians would be funneled in that direction to cross the street, and where their attention would be diverted by looking for traffic. He also noted that the slightly uneven sidewalk and street, although not rough, might also be a distraction for pedestrians. Mr. Frenzel showed the court photographs of other signs in the area mounted on similar posts; one of these was attached somewhat higher and the other had two signs, one affixed to the wooden post at the same level as the sign at issue, and another mounted above the wooden post on a metal extension post. He explained that these photographs demonstrated that the sign could have been mounted higher. However, he admitted that, based on her testimony, Ms. Alexander must have walked by one or more of these signs on her way to and from the riverboat. Because it was open and obvious, with no obstructions to conceal it, she clearly should have seen the sign that she walked into. He said, "You could see it. It's visible, it's not hidden, it's there, and it can be seen.... In hindsight, she should have seen it; she did not."
Charles Booksh, who was walking three or four yards behind Ms. Alexander and her daughter when the accident occurred, said it was about midday on a bright, clear day and it had not been raining. There were no visual or side obstructions that prevented him from seeing the post or the sign; it was apparent to him. He recalled that Ms. Alexander might have been chatting with her daughter just before she ran into the sign.
Dwight Fox, the chief traffic engineer for the city/parish, testified as an expert in the field of traffic engineering. He recalled that between the river road and the post Ms. Alexander ran into, there are three similar tall wooden posts with signs affixed to them at approximately the same height as the sign she hit. Mr. Fox said there was no reason why a pedestrian would not be able to see the sign, because it was in clear view, with no obstructions that would prevent anyone from seeing it. He also testified that, before this accident, his office had not received any complaints about the location or placement of the sign; this incident was the only complaint involving this sign. He said that, as narrow as the sign is, mounted on that type of post, he would not consider it to be a hazard. However, Mr. Fox admitted that, because the sign is mounted lower than the minimum prescribed by the Uniform *266 Traffic Control Devices Manual, it does violate that standard.
In oral reasons, the trial court stated:
At first blush, this seems like a fairly obvious case where someone running into a sign, you question how that you (sic) can happen if they are watching where they're going. But in this case, in this particular location, I find that this is an unreasonably dangerous condition, primarily because of the location of this sign at the crosswalk. ... [A]ctually the crosswalk begins, for people walking in the direction that Mrs. Alexander was walking, even with or shortly before the back side of that post. And this obviously invites people, or pulls people towards that post in making that corner to turn into the crosswalk.
There are also other distracters (sic) that are present. As I mentioned previously, there is the uneven walking surface created by the bricks. It is at a corner, and as a crosswalk across a vehicular lane of travel, obviously people are looking at the traffic. So I think there are a number of reasons for pedestrians to have their vision pulled away from this sign and not to see this sign. And obviously, at something less than five feet high, the sign is too low, whether it's just from common sense or as a violation of the provision of the manual of uniform traffic control devices. So, as I said, I believe it does create an unreasonable risk of harm.
The court found the city/parish liable. Because Ms. Alexander was also at fault for failing to be sufficiently attentive to this sign, which was in open view, the court apportioned 30% fault to her. Finding that not all of her dental work was attributable to the accident, the court awarded her a portion of her medical expenses, $10,000 in general damages, and costs, including expert witness fees. After reducing the award by her percentage of fault, the court ordered the city/parish to pay her $8,400, plus legal interest from date of judicial demand, and to pay all costs, including $300 for each of the four expert witnesses.
In this appeal, the city/parish assigns as error the trial court's finding that the sign presented an unreasonable risk of harm to a reasonably careful pedestrian. The city/parish also contends the court erred in assessing less than one hundred percent negligence to Ms. Alexander.

APPLICABLE LAW AND STANDARD OF REVIEW
At the time of this accident, proof of strict liability on the part of a public entity, such as the city-parish, was governed by LSA-C.C. art. 2317.[2] Article 2317 states, in pertinent part:

*267 We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of things which we have in our custody.
Under this article, the plaintiff has the burden of proving that (1) the thing which caused damages was in the care, custody, and control of the defendant; (2) the thing had a vice or defect which created an unreasonable risk of harm to others; and (3) the defect in the thing was a cause-in-fact of the resulting injury. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990); McAllister v. Coats, 96-1069 (La.App. 1st Cir.3/27/97), 691 So.2d 305, 309-10. Of these elements, the only issue in this case is whether the sign had a vice or defect which created an unreasonable risk of harm.
The ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362, 364. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Even when several experts opine that a defect exists and is hazardous, the court's conclusion that the defect created an unreasonable risk of harm may still be clearly wrong when the risk-utility balancing test is applied. See Boyle v. Board of Supervisors, Louisiana State Univ., 96-1158 (La.1/14/97), 685 So.2d 1080, 1082-83; Maxwell v. Board of Trustees for State Colleges and Universities, 96-1207 (La.App. 3rd Cir.3/19/97), 692 So.2d 641, 646-47, writ denied, 97-0996 (La.6/13/97), 695 So.2d 987.
In determining whether a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair. Reed, 708 So.2d at 365. The unreasonable character of the defect must be decided on the particular facts and circumstances of each case. Boddie v. State, 27,313 (La.App. 2nd Cir.9/27/95), 661 So.2d 617, 623.
A public entity is obligated to maintain its sidewalks in a reasonably safe condition. The defect or condition complained of must be one that poses an unreasonable risk of harm to a reasonably careful pedestrian. McDade v. Town of Oak Grove, 545 So.2d 1276, 1278 (La.App. 2nd Cir.1989). A pedestrian has a duty to see that which should have been seen. Thornton v. Board of Supervisors of Louisiana State Univ., 29,898 (La.App. 2nd Cir.10/29/97), 702 So.2d 72, 75. The fact that an accident occurred as a result of a defect does not elevate the condition of the thing to that of an unreasonably dangerous defect. See Shipp v. City of Alexandria, 395 So.2d 727, 729 (La.1981). The past accident history of the defect in question is a factor to be taken into consideration in determining the relative risk of injury. Reed, 708 So.2d at 365; Boyle, 685 So.2d at 1083. The degree to which a danger may be observed by a potential victim is another factor considered in the determination of whether a condition is unreasonably dangerous. Wallace v. Slidell Memorial *268 Hosp., 509 So.2d 69, 72 (La.App. 1st Cir.1987). Lighting conditions at the time of the accident may be taken into consideration. See Wallace, 509 So.2d at 72. The time of day of the accident is clearly relevant in determining whether a condition posed an unreasonable risk of injury. Fortune v. City of New Orleans, 623 So.2d 701, 703 (La.App. 4th Cir.), writ denied, 629 So.2d 1126 (La.1993). When a dangerous condition is patently obvious and easily avoidable, it can hardly be considered to present a condition creating an unreasonable risk of harm. Phipps v. Amtrak, 94-1876 (La.App. 1st Cir.11/20/95), 666 So.2d 341, 343, writ denied, 95-3012 (La.2/28/96), 668 So.2d 368; Thornton, 702 So.2d at 74; Wilson v. City of New Orleans, 95-2129 (La.App. 4th Cir.4/30/97), 693 So.2d 344, 348, writ denied, 97-1701 (La.10/13/97), 703 So.2d 613.

ANALYSIS
The trial court had testimony and evidence supporting its conclusion that the sign at issue in this case may have been defective as a result of its height and location; thus, there was a reasonable factual basis in the record for this finding of the court. However, our inquiry under the manifest error standard does not end there. Though the court discussed whether the defect created an unreasonable risk of harm, its oral reasons do not clearly apply the risk-utility test to the particular circumstances of this case. Although it is not necessary that the fact finder state all the factors considered and its findings on each,[3] we find that the risk-utility balancing test compels a different conclusion from that reached by the trial court.
Evaluating the gravity of the harm, we note that the injuries to Ms. Alexander were not severe. She sustained damage to her teeth; this injury caused her pain and inconvenience, but is not permanently disabling. She also suffered a deviated septum that continued to cause occasional problems for her at the time of trial. However, according to her own testimony, her doctor had advised her this condition could be rectified by surgery, but she chose not to have this treatment. The trial court's award of only $10,000 for general damages reflects this assessment of her injuries. Also, by the very nature of this defect, the most probable risk of injury is to a pedestrian walking into the sign, and it is unlikely that anyone walking into a sign will sustain serious injuries. Therefore, the gravity of the harm is low.
Based on our review of the evidence, we conclude the trial court's error is in its assessment of the risk presented by the sign. We cannot agree that the height of the sign, combined with its placement near the crosswalk, created an unreasonable risk of harm to a reasonably careful pedestrian. The sign was at eye level, open, and obvious; it was not a hidden defect. Ms. Alexander had passed it and others like it on her way to and from the riverboat, so she should have been aware that the taller posts along the way had signs on them. The photographs show there were a number of such signs in the vicinity, some of which appear to be even lower than the one at issue. There were no trees, bushes, vehicles, or persons that might have obstructed her view of the sign. It was a clear, bright day. When a risk is so apparent, obvious, and easily avoidable by persons exercising ordinary care and prudence, it cannot be said to be unreasonably dangerous. See Wilson, 693 So.2d at 348.
Additionally, considering the accident history of this sign, we note that it was in a high traffic area, where many pedestrians were traveling between the parking lot and the riverboat. Yet, as in Boyle, Reed, and Wilson, this was the first reported accident involving this sign. No other pedestrian had ever reported walking into this sign, nor were there any reported complaints about its visibility, height, or placement.
*269 Although Ms. Alexander said she was looking down to be sure she did not trip on the rough sidewalk, the expert who testified on her behalf indicated the surface was not rough and did not present a tripping hazard. A pedestrian cannot just walk blindly forward, keeping her eyes on her feet, without occasionally glancing up to see if there might be an obstacle or oncoming pedestrian in her path. Moreover, this sign was not in Ms. Alexander's path; it was placed at the edge of the sidewalk area, in a direct line with the series of posts that separated the sidewalk from the street.
The trial court concluded that the sign's placement on the edge of the crosswalk made it more hazardous than the other similar signs along the way, because at this point a pedestrian's attention might be diverted. However, a pedestrian should be paying greater, not lesser, attention to her surroundings when preparing to cross a street. Even little children are taught to "Stop, look, and listen" before crossing the street. Ms. Alexander was aware that she was approaching the crosswalk; she testified that she put her hand out toward the tall post to help her make the turn. But she obviously did not look up to see if any cars were coming, and she apparently did not intend to slow down or stop before making the turn onto the street. Rather than being more dangerous because of its proximity to the crosswalk, we find the sign's placement there actually made it a lesser risk to the reasonably prudent pedestrian.
Weighing the social utility of the sign, it is apparent that the message it conveys is intended to keep vehicles from parking along the street. This street leads directly to the riverboat casino, so it is likely to have considerable vehicular and pedestrian traffic at all hours of the day and night. The sign is obviously meant to enhance the safety of the general public by preventing blockage and narrowing of the roadway.
With reference to the cost of remedying the defect, the trial court received evidence in the form of expert testimony and a photograph, indicating the sign could have been elevated above the level of the post simply by affixing a metal extension rod to the post. Therefore, the cost of remedying the problem with this particular sign and the few others like it in this locale would be minimal. However, the record does not indicate how many other signs with similar elevations might exist along the city/parish sidewalks. As the supreme court noted in Reed, the overall cost to eliminate all such minor defects could be staggering. See Reed, 708 So.2d at 366.
Considering all of these factors, we conclude that this sign did not present an unreasonable risk of harm to a reasonably careful pedestrian. Therefore the trial court was clearly wrong. This finding renders unnecessary any discussion of allocation of fault.

CONCLUSION
Based on the foregoing, the judgment of the trial court is reversed. All costs of this appeal are assessed against Ms. Alexander.
REVERSED.
NOTES
[1] One expert estimated the width of the sign as eighteen inches, which would leave about seven inches of sign protruding from each side of the post. However, it is apparent from the photographs admitted into evidence that the other expert's estimate of twelve inches wide is more accurate.
[2] As applied to public entities, the legislature modified the imposition of strict liability under Article 2317 by enactment of LSA-R.S. 9:2800, effective July 12, 1985, which provided, in pertinent part:

[N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
The constitutionality of this statute was called into question in a number of cases as a violation of the abrogation of sovereign immunity contained in Article XII, § 10(A) of the Louisiana Constitution. Effective November 23, 1995, that constitutional provision was amended to allow the legislature to limit the liability of public entities, including the circumstances giving rise to liability. LSA-R.S. 9:2800 was reenacted, effective that same date, by 1995 La. Acts No. 828.
In the recent case of Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14, the Louisiana Supreme Court held that, prior to the November 23, 1995 effective date of the amendment, LSA-R.S. 9:2800 was an impermissible legislative act in direct conflict with Article XII, § 10(A)'s unequivocal waiver of sovereign immunity and was unconstitutional. Also, because the reenactment of the statute, effective the same date as the amendment, was a substantive change in the law, LSA-R.S. 9:2800 could not be applied retroactively. Because the accident at issue in this case occurred before November 23, 1995, the provisions of Article 2317, unmodified by LSA-R.S. 9:2800, are applicable.
[3] See Boyle, 685 So.2d at 1083.