844 So.2d 360 (2003)
Cassie WILLIAMS and Mark Williams, Individually and on Behalf of Their Minor Child, Shelby Williams
v.
CITY OF BATON ROUGE, et al.
No. 2002 CA 0682.
Court of Appeal of Louisiana, First Circuit.
March 28, 2003.
*363 Aidan C. Reynolds, Christopher L. Whittington, Baton Rouge, for Plaintiffs-Appellees-Appellants Cassie Williams, et al.
Michael E. Ponder, Parish Attorney, Randy J. Cashio, Special Assistant Parish Attorney, Baton Rouge, for Defendant-Appellant-Appellee City of Baton Rouge/Parish of East Baton Rouge.
Before: PARRO, MCDONALD, and CLAIBORNE,[1] JJ.
PARRO, J.
The City of Baton Rouge/Parish of East Baton Rouge (the City/Parish) appeals a judgment against it and in favor of Cassie Williams (Cassie) and her minor daughter, Shelby, for damages suffered by Cassie when she tripped and fell on a broken sidewalk that was in the City/Parish right-of-way. Cassie answered the appeal, seeking an increase in general damages, an assessment of additional expense items as court costs, and a reversal of the trial court's finding that she was 40% at fault. We amend the judgment and affirm as amended.

FACTUAL AND PROCEDURAL BACKGROUND
On February 28, 1994, Cassie, who was then twenty-two years old and working as a phlebotomist at the University Plasma Center (the Plasma Center) on Chimes Street in Baton Rouge, was walking toward her car after work when she tripped on a broken, depressed section of the sidewalk and fell. Her fall caused a ruptured disc with nerve root entrapment on the right side, and on May 12, 1994, she underwent a lumbar laminectomy with diskectomy at the L5-S1 level. Extensive scar tissue formed around and attached to her spinal nerve root after the surgery, leaving her with chronic pain that cannot be remediated. As a result, she is and always will be severely limited in her daily activities and employment opportunities.
Suit was filed against the City of Baton Rouge on August 16, 1994, and a later amendment named the Parish of East Baton Rouge.[2] The City/Parish admitted *364 that the sidewalk and adjoining flower bed were within its right-of-way and that it was responsible for the care and maintenance of this area. After a two-day trial in December 2001, the trial court found that the depressed area of the sidewalk where Cassie fell had a difference in elevation of two to two and one-half inches from the rest of the sidewalk and that the depression was at least partially obscured by overgrown plant material from the adjoining flower bed. The court concluded that this combination created an unreasonable risk of harm and caused Cassie's injuries. The court also found Cassie was 40% at fault in the accident for her failure to notice and avoid the broken and depressed portion of the sidewalk. The judgment awarded her past medical expenses of $24,374.06, past lost earnings of $48,216.71, future lost earnings of $279,043.75, and general damages of $165,000, and awarded Shelby $8,000 for loss of consortium.[3] The court also assessed some expert witness fees as costs of court, but struck through additional expense items totaling $1,054.37 that were listed on the judgment. All damages and court costs were reduced by 40% for Cassie's comparative fault.
In this appeal, the City/Parish assigns as error the trial court's findings that the sidewalk defect created an unreasonable risk of harm and that it owed a duty to a pedestrian who was not reasonably careful. In her answer to the appeal, Cassie assigns as error the trial court's reliance on its faulty recollection of events, which was not based on evidence in the record and contributed to the court's assessment of comparative fault. She also contends that the court's general damage award was so low as to constitute an abuse of discretion and that its refusal to award as court costs certain expense items that are statutorily authorized and were stipulated to by the parties was also an abuse of discretion.

UNREASONABLE RISK OF HARM/SCOPE OF DUTY
Louisiana Civil Code article 2317[4] imposes liability upon the custodian *365 of a defective thing that creates an unreasonable risk of harm to others. Hebert v. ANCO Insulation, Inc., 00-1929 (La.App. 1st Cir.7/31/02), 835 So.2d 483, 499-501. For an accident that occurred before November 23, 1995, a plaintiff attempting to impose liability under Article 2317 on the custodian of a defective thing must prove that (1) the thing had a vice or defect; (2) the defect presented an unreasonable risk of harm to others; (3) the thing was in the defendant's custody; and (4) damage was caused by the defect.[5]Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). If a plaintiff fails to prove any one of these facts, his Article 2317 claim falls. Young v. City of Plaquemine, 02-0280 (La.App. 1st Cir.5/10/02), 818 So.2d 898, 899, writ denied, 02-1601 (La.9/30/02), 825 So.2d 1196. Of those four factors, the City/Parish does not contest that the sidewalk was defective, that it had "custody" of the area, and that Cassie's injuries were caused by the defective condition. Therefore, the only contested issue in this appeal is whether the defective condition of the sidewalk presented an unreasonable risk of harm to others.
There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. Many factors are considered and weighed, including the gravity and risk of harm, individual and societal rights and obligations, and the social utility, including cost of repair. See Boyle v. Board of Supervisors, Louisiana State Univ., 96-1158 (La.1/14/97), 685 So.2d 1080, 1083; Vinccinelli v. Musso, 01-0557 (La.App. 1st Cir.2/27/02), 818 So.2d 163, 165-66, writ denied, 02-0961 (La.6/7/02), 818 So.2d 767. The trier of fact cannot apply the unreasonable risk criterion mechanically. Lasyone v. Kansas City So. R.R., 00-2628 (La.4/3/01), 786 So.2d 682, 693-94. State entities are not liable for every irregularity in a street or sidewalk. Boyle, 685 So.2d at 1082. The size of the defect in an area where people walk is of primary importance in determining if a duty to a pedestrian has been breached. Williams v. Leonard Chabert Med. Ctr., 98-1029 (La.App. 1st Cir.9/26/99), 744 So.2d 206, 209, writ denied, 00-0011 (La.2/18/00), 754 So.2d 974. The fact that an accident occurred because of a vice or defect does not elevate the condition of the thing to that of an unreasonably dangerous defect. The vice or defect must be of such a nature as to constitute a dangerous condition that would be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances. Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983); Lasyone, 786 So.2d at 694. Thus, the City/Parish's second assignment of error, claiming it did not owe a duty to Cassie because she was not being reasonably prudent and careful, is subsumed by and interwoven with its first assignment of error concerning whether the defective condition of the sidewalk presented an unreasonable risk of harm.
*366 The degree to which a danger is evident to a potential victim is one factor in determining whether the condition is unreasonably dangerous. Shavers v. City of Baton Rouge/Parish of East Baton Rouge, 00-1682 (La.App. 1st Cir.9/28/01), 807 So.2d 883, 886, writ denied, 01-2848 (La.1/4/02), 805 So.2d 207. If a dangerous condition is patently obvious and easily avoidable, it cannot be considered to present a condition creating an unreasonable risk of harm for purposes of strict liability. Alexander v. City of Baton Rouge, 98-1293 (La.App. 1st Cir.6/25/99), 739 So.2d 262, writ denied, 99-2205 (La.11/5/99), 750 So.2d 188.
The ultimate determination of whether a condition creates an unreasonable risk of harm is subject to review on appeal under the manifest error standard. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362, 365; Borruano v. City of Plaquemine, 97-1926 (La.App. 1st Cir.9/25/98), 720 So.2d 62, 64. Under this standard, the trial court's findings are reversible only when there is no reasonable factual basis for the conclusions, or if the record reveals those conclusions are clearly wrong. Aucoin v. State, through Dep't of Transp. and Dev., 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62, 65; Dennis v. The Finish Line, Inc., 99-1413 (La.App. 1st Cir.12/22/00), 781 So.2d 12, 21, writ denied, 01-0214 (La.3/16/01), 787 So.2d 319. Where two permissible views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880, 883 (La. 1993).
With these precepts in mind, we review the factual information in the record concerning the defective area of the sidewalk where Cassie fell and the circumstances under which she fell. The record includes several sets of photographs of the site. Cassie photographed the area on May 11, 1994, the day before her surgery. Gwen Bourgeois, who was working for an independent claims adjusting service at the time, photographed the site for the City/Parish in late December 1994 and early January 1995. Philip Beard, a civil engineer who provided expert testimony on Cassie's behalf, photographed and measured the broken area on November 2, 1999. Additionally, Jerome M. Klier, a civil engineer who, at the time of trial, was Deputy Director of the Department of Public Works for the City/Parish, photographed and measured the site in December 2001. Klier enlisted the help of a landscape architect, Greg Jones, who sketched the site in December 2001 and noted the measurements of the sidewalk and surrounding area.
This visual evidence shows that at the accident site, the sidewalk parallels and abuts the curb of Chimes Street, which runs east-west with a downhill slope to the west. The sidewalk is five feet five inches wide in front of Arzi's and has expansion joints cutting across it at regular intervals. Arzi's is to the west of and slightly downhill from the Plasma Center. Between these two businesses is an aggregate-finished driveway running perpendicular to and across the smoother, "brush-finished" sidewalk. Where the driveway meets the sidewalk in front of Arzi's, the edge of the driveway curves into the sidewalk and ends at an expansion joint in the sidewalk. The curve of the driveway is not north of the sidewalk, as one would expect, but is entirely within the sidewalk area. The northern portion of the sidewalk within the driveway curve forms a "quarter-circle" between the expansion joint and the edge of the driveway. Immediately to the west of the expansion joint, the northern portion of the sidewalk has cracked, forming another "quarter-circle." These two areas *367 along the northern edge of the sidewalk form a roughly semi-circular, crescent-shaped area of sidewalk that has sunken into the adjacent flower bed in front of Arzi's.[6] The northern, straight edge of the semi-circle where it adjoins the flower bed is four feet long, and the apex of the semi-circle at the expansion joint extends about one foot five inches into the width of the sidewalk. This leaves four feet of intact sidewalk between the depressed area and the curb of Chimes Street. Where the northern edge of the sidewalk meets the curved edge of the aggregate driveway, the difference in elevation between the two surfaces is four inches. According to Cassie's testimony, her right foot hit the edge of the depressed area near its widest point, where there was about a two and one-halfinch drop between the aggregate driveway surface and the adjoining sidewalk surface.
The visual evidence further shows grassy plants growing in the sidewalk's expansion joints and also in the crack along the curved portion of the semi-circle between the sidewalk and driveway surfaces. In one of the photographs taken in 1999, the deepest portion of the semi-circular depression is completely covered by grassy plant material. The photographs also show that plants in the adjoining flower bed sometimes and in some places extended several inches over the edge of the sidewalk. One photograph shows the far end of the flower bed where the sidewalk turns the corner, where tall grassy weeds are leaning over the edge of the sidewalk and covering about six inches of the walkway; other photographs of this corner show a cleanly-trimmed edge with no weeds at all. It is obvious from these photographs that the condition of the plant growth in the area varied considerably. Cassie testified that when she fell, the flower bed was completely overgrown with weeds that partially obscured the edge of the sidewalk where her foot hit. She also noted that when she took the photographs several months later, the flower bed had been cleaned out and the plant growth had been trimmed back.
Her fall was witnessed by Greg Gomez, a handyman who was working at the site to get the building ready for use by Arzi's.[7] He was "taking a smoke break" and "girl watching" from his vantage point just inside Arzi's glass doors that face Chimes Street at the top of the aggregate driveway. Gomez said he saw Cassie fall "in the area where the concrete is uneven" and "[s]o I assumed that's what caused her to fall." He testified that the flower bed was unkempt, because the building had been vacant for some time before Arzi's began readying it for use. Gomez said that when Cassie fell, the weeds in the flower bed were "growing out and in the cracks there," obscuring the depressed area of the sidewalk "to some degree." *368 He said the vegetation was more than what appeared in the photographs Cassie took of the site in May and that when she fell, there was "[a] little more coming from the flower bed, but mostly stuff growing out of the cracks." Shortly after she fell, he pulled the weeds out of the flower bed and "trimmed the bushes and stuff." Gomez said he had noticed the dilapidated sidewalk and overgrown flower bed before Cassie fell, because it was unsightly and it was his job to make the place look good before the restaurant opened. The flower bed and sidewalk cleanup was the last thing he did on that job.
Cassie testified that she had just left work about 4:30 or 5:00 p.m. and was walking in a westerly direction along Chimes Street toward the parking lot where her car was parked. As she approached Arzi's, she stepped into the sidewalk depression, which she described as "this eroded place in the sidewalk" that had a "caved in place" with "grass growing out of it." She said this grass and the weeds in the flower beds "pretty much covered" the two and one-half-inch depression in the sidewalk, which she had never noticed before. The difference in elevation caused her foot and ankle to twist and she fell, hitting one or both knees and elbows on the ground and severely wrenching her back. More specifically describing the area, she said:
All these weeds in the flower bed were quite tall, and then this area where it looks like the sidewalk has broken away, there was grass and weeds growing out of there, and it was justthey were just kind of laying over. I did not see the break in the sidewalk at all because of the weeds being so tall, and it was just completely grown over.
Cassie said that during the several weeks she worked at the Plasma Center, she had walked past the depressed section of the sidewalk before, but had "never noticed this break in the sidewalk."
Beard testified that a depressed portion of sidewalk such as this could be a problem for pedestrian traffic even if it were not covered by plant materials, "because you can trip coming up slope or you can turn your ankle or fall going down slope." He further stated:
Cover this with weeds and itthe degree of danger goes up pretty high because you don't see [it]. And if you think there's concrete there, which there would be an indication to make you think that that was sidewalk and you stepped there, obviously you could experience a misstep.
Beard said the combination of factors in this location posed a high risk of misstep to pedestrians. He measured the depression at the point where Cassie said she had stepped and found it was two and one-fourth to two and one-half inches deep. For a person who does not know that there is a drop-off and is walking along what appears to be the sidewalk, Beard said "the likely result is going to be that your foot will twist or turn or you'll actually lose your balance, or all of the above." Beard said that he based his opinion that the condition was an unreasonable risk on the fact that the depressed area existed and that it was somewhat obscured.
Klier confirmed the measurements of the difference in elevation between the aggregate driveway, the intact sidewalk, and the broken area of sidewalk, and admitted that the sidewalk and adjoining flower bed were entirely within the City/Parish right-of-way. He noted that this sidewalk has very heavy pedestrian use, being directly across the street from the LSU campus. Klier said the City/Parish does not have any regular inspection or repair system for its 2000 plus miles of sidewalk, stating:

*369 Our inspection is a complaint based inspection. If we receive a complaint then we'll investigate and see if the complaint is legitimate and if it needs attention at that time.
Concerning the sidewalk along Chimes Street, Klier said that the City/Parish records showed there were "some complaints but nothing that dealt with the sidewalk per se at this location." He stated that although a sidewalk can have a gradation for drainage or to accommodate a slope, the sidewalk surface is supposed to be level so that pedestrians will not trip and fall. He admitted that at the time of the accident, it was possible that some or all of the semi-circular area of depressed sidewalk was obscured by vegetation from the flower bed, which was also within the City/Parish's area of responsibility. Klier admitted that this defect needed to be corrected and said the City/Parish would repair the sidewalk within thirty or sixty days after the trial. He could not explain why the City/Parish had not corrected the defect immediately after getting notice of its existence when the lawsuit was filed in 1994.
Dinah Brown, who worked at the Plasma Center for several years, said its employees regularly used this sidewalk when going to and from the parking area where their cars were parked. She also said she had always been aware of the broken concrete area and had never seen it completely covered by vegetation.[8]
Evaluating this evidence in the light of the jurisprudential guidelines, we conclude that the trial court was not manifestly erroneous in finding the City/Parish liable for Cassie's injuries. Although the court did not specifically state that it found the sidewalk defect presented an unreasonable risk of harm to a reasonably prudent pedestrian, this conclusion is implicit in its findings. In this case, the evidence does not indicate that this area of the sidewalk presented a high risk, since it was heavily traveled and there apparently were no previous complaints concerning this particular defect. However, the difference in elevation at this site was significantup to four inchesand it is quite foreseeable that a pedestrian might trip on such a defect, fall, and suffer a broken arm or leg or, as in this case, a serious back injury. The gravity of the harm to Cassie was severe and permanent. Obviously, a sidewalk has a high utility, but its usefulness is diminished when it is not level. The City/Parish had the responsibility for the care and maintenance of the area, but admitted that it conducts no routine inspections of any of its sidewalks. Rather, it waits for the "first accident" or complaint before it checks the condition to see if repair is warranted. Yet, even after being made aware of the defect in this case, which Klier admitted needed to be repaired, the City/Parish did nothing for over six years. This belies the City/Parish's claim that it addresses dangerous conditions when it is made aware of them. There was no testimony concerning the cost of repair, but Klier acknowledged that the City/Parish has the equipment and ability to make the necessary repairs and would do so within thirty to sixty days after the trial.
The evidence also supports the conclusion that the defect in this case was of *370 such a nature as to constitute a dangerous condition that would be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances. This case is not like the situation in Phipps v. Amtrak, 94-1876 (La.App. 1st Cir.11/20/95), 666 So.2d 341, writ denied, 95-3012 (La.2/28/96), 668 So.2d 368, in which the plaintiff had traversed a recessed train aisle several times within the hour preceding her fall, stepping up and down each time, and so was clearly aware that the aisle was designed with a recessed area between the seating areas. Nor is it comparable to Alexander, 739 So.2d 262, in which a pedestrian walked into an eye-level sign at the edge of a crosswalk. Similarly, in Summerville v. Louisiana Nursery Outlet, Inc., 95-2224 (La.App. 1st Cir.6/28/96), 676 So.2d 238, writ denied, 96-1921 (La.11/1/96), 681 So.2d 1263, this court affirmed the finding that a one-inch depression at the edge of a parking lot, where that edge was clearly marked with a yellow stripe, did not create an unreasonably dangerous condition for the ordinary, prudent individual. In those cases, the recessed aisle, eye-level sign, and striped edge were open and apparent. In this case, although the plant growth in the sidewalk cracks and along the curved edge may have been apparent, it was not apparent that the plants concealed a two and one-half-inch to four-inch drop-off. That fact distinguishes this case from Boyle, 685 So.2d 1080, in which a one-inch difference in sidewalk elevation was in the middle of the walkway and was not disguised by plant material, and Shavers, 807 So.2d at 886, where "nothing whatsoever hid or obstructed [the plaintiff's] view" of a one and three-fourths-inch raised portion of sidewalk. In south Louisiana, it is not unusual for plant material to grow in expansion joints and various cracks in the sidewalks. Nor is it unusual for plant material alongside a walkway to overhang and obscure a portion of the sidewalk. However, underneath or alongside the plant material, the prudent pedestrian using ordinary care expects the sidewalk to be reasonably level. In this case, the plant material was hiding something quite dangerousa significant difference in elevation. It was this combination of ingredients that made this situation one that could be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances. The evidence supports the trial court's findings, and we find no manifest error in its conclusion that the depression in the sidewalk, which was partially or wholly obscured by plant material, constituted a defect that presented an unreasonable risk of danger to the ordinary, prudent pedestrian.

COMPARATIVE FAULT
Louisiana Civil Code article 2323(A)[9] provides, in pertinent part, as follows:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined.... If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss. *371 In assessing the nature of the conduct of the parties, various factors may influence the degree of fault, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, 611.
A determination of the allocation of fault by the trier of fact is a factual finding. Guidroz v. State, Through the Dep't of Transp. and Dev., 94-0253 (La. App. 1st Cir.12/22/94), 648 So.2d 1361, 1366. Factual findings cannot be overturned in the absence of manifest error. The issue to be resolved by this court is not whether the trial court was right or wrong, but whether the fact finder's conclusion was a reasonable one. Cazes v. Parish of West Baton Rouge, 97-2824 (La. App. 1st Cir.12/30/98), 744 So.2d 54, 61.
Cassie argues that this court should conduct a de novo review of the allocation of fault, because in reaching its decision on this issue, the trial court committed legal error by relying on facts that were not in the record and were not accurate. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735; Turner v. Ostrowe, 01-1935 (La.App. 1st Cir.9/27/02), 828 So.2d 1212, 1216, writ denied, 02-2940 (La.2/7/03), 836 So.2d 107.
In oral reasons for judgment, the trial court stated:
But I think there is a degree of comparative fault in this case.
The testimony of Ms. Williams and Mr. Gomez was that this area was substantially covered by vegetation. This was the end of February 1994. We had a very severe freeze in December of 1993, I believe it was, that resulted in an explosion at Exxon which is why I remember the date. And we had temperatures down in the teens for a period of days. As I said, this was the end of February, so I question what vegetation there may have actually been in the end of February of 1994 to cover this area. But even if there was, why would a person with a four-foot unobstructed sidewalk walk in an area that was covered by vegetation?
I specifically asked Ms. Williams if there was anyone else on the sidewalk and she said there was not.
It was uncontradicted from the testimony of the plaintiff's expert, Mr. Beard, as confirmed by the testimony of the City-Parish's engineer, Mr. [Klier], that there was four feet of unobstructed sidewalk on which Ms. Williams could have walked. So if this area was covered with vegetation, why would she choose to step there rather than on the unobstructed portion? Of course, if there was no vegetation or if the vegetation had been killed back by the frost and the freeze in that period, then there was a fairly obvious depression there, and I question why she would have stepped there also if she was paying attention.

*372 It's alleged this occurred at dusk; she said 4:30 to 5 o'clock. The shortest day of the year is December 22nd. As of February 28th the days were getting longer. I think between 4:30 and 5 o'clock there would have been sufficient light, natural light as well as street lights to illuminate this area.
So I find that Ms. Williams is partially at fault in the occurrence of this incident, and I assess liability sixty percent to the City-Parish and forty percent to Ms. Williams.
The allegedly erroneous information concerned an explosion at Exxon, which Williams avers did not occur in 1993, and therefore was not an accurate reference point for the trial court's recollection concerning the freezing weather and its possible effect on plant growth. The court's recollection is irrelevant as to matters not in evidence. Clearly, the court erred in relying on this information, which was outside the record. However, when the entire context of the court's reasons are considered, we do not believe this error materially affected the outcome, skewed the trial court's finding of a material issue of fact, or deprived Cassie of substantial rights. After commenting on the freeze, the court went on to say that even if the depression had been obscured by vegetation, Cassie still bore some responsibility to avoid this overgrown area and to walk on the unobstructed four feet of intact sidewalk. Even though we have affirmed the court's finding that the sidewalk condition presented an unreasonable risk of harm to a prudent pedestrian, we must also agree that Cassie was not as prudent as she could have been under the circumstances. Although she was unaware of the danger hidden by the plants, she could have easily avoided that edge of the sidewalk by walking a few steps to the left, which would not have inconvenienced her at all as she headed for her car. There was nothing in the situation that required haste, distracted Cassie from watching where she was going, or interfered with her ability to evade the area. Therefore, we find no legal error or manifest error in the trial court's allocation of 40% of the fault to Cassie.

GENERAL DAMAGES
In her answer to the appeal, Cassie also claims the trial court's award of only $165,000 in general damages is an abuse of discretion. She urges this court to consider her chronic back and leg pain, the frustrating limitations of her daily activities, and the intermittent bouts of extreme pain she experiences. She was only twenty-two years old when the accident occurred; the physical and mental pain caused by her injury has severely impacted her life as a young wife and mother and will continue without abatement for the rest of her life.
Much discretion is left to the judge or jury in the assessment of general damages. LSA-C.C. art. 2324.1. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 *373 So.2d 332, 335 (La.1976); Dennis, 781 So.2d at 30.
The evidence shows that Cassie's fall caused a large herniated disk at the L5-S1 level, with nerve root impingement that caused excruciating pain in the lower back, radiating pain in the right hip, thigh, and leg, and weakness and loss of reflex in the right ankle and foot. Conservative treatments were wholly ineffective, and on May 12, 1994, a lumbar laminectomy with diskectomy was performed by orthopedist Thad Broussard. The surgery freed the nerve and gave Cassie several months of improvement. However, she never became totally free of pain, and an MRI in early 1995 showed the development of scar tissue at the surgical site. Dr. Broussard concluded the scarring was attached to the nerve root and was putting pressure on it, causing the pain symptoms Cassie was experiencing. The only course of treatment was for Cassie to receive periodic epidural steroid injections and to take anti-inflammatory medications, pain relievers, and muscle relaxers to relieve the pain. Dr. Broussard said he would not recommend surgery, because removing the scar tissue would risk further damage to the nerve root, and even if the scar tissue were successfully removed, it was likely to grow back and cause the same or worse problems. By the time of trial, a recent MRI had revealed additional degenerative changes at the L3-4 and L4-5 levels, which Dr. Broussard attributed to the increased strain put on these vertebrae because of the weakness at the L5-S1 level. His prognosis was that Cassie will suffer chronic back pain and radiating pain into her right hip and leg for the rest of her life, with periodic severe exacerbations of that pain. The absent ankle reflex on the right side is permanent. Surgery is not a treatment option because of the risk of nerve damage and increased scarring. Dr. Broussard restricted Cassie's bending, lifting, twisting, mopping, sweeping, vacuuming, prolonged sitting, prolonged standing, prolonged driving, and overhead reaching, any of which could bring on an extremely painful episode.
Dr. Broussard's conclusions were corroborated by another orthopedist, Dr. Johnny Robinson, from whom Cassie sought treatment after moving to Mississippi. She was also examined three times during 1998 and 1999 by Dr. Louis Harkey, a neurosurgeon, who also agreed that her pain had become chronic and that another surgical intervention would be too risky. Dr. Harkey said he would not place any restrictions on her activities, because she was unlikely to do any further damage, but he acknowledged that activity may cause pain. Beyond symptomatic and supportive care, the doctors could offer no relief.
Cassie testified that she experiences daily pain in her back, right hip, and right leg. She described the pain as "very severe"; it limits her activities during the day and disrupts her sleep at night. She tried to go back to work and managed to work for several years after the accident. However, she took frequent breaks and had a lot of help, including back massages, from the nurses she worked with. Ultimately, she concluded she was only aggravating the situation by standing, bending over patients, drawing blood, and sitting at a microscope, because all of these activities made the pain worse. She tried to return to school, but could not remain seated in a classroom for full class periods. Just three months before the trial, she had an episode of such severe pain that none of her medications were effective, and she went to the emergency room for treatment. Cassie's family lives near her in Mississippi; her mother and aunt help her with housework, caring for her children, *374 shopping, and other daily activities. She is unable to lift her small children in and out of car seats or strollers. Even at trial, she experienced obvious pain due to the prolonged sitting in the witness chair, and the court allowed her to stand any time she wanted to while giving her testimony.
Bobby S. Roberts, a certified vocational evaluator, tested Cassie in August 2000 to determine whether she could meet the requirements for employment and if so, what kinds of employment. Academically, she was qualified to pursue a college degree and could finish the curriculum for a registered nurse, which coincided with her highest interest area of skilled science. However, on the work sample tests, she was only able to do the sedentary tasks, which he defined as seated work, and she had a lot of functional difficulty with sustained testing. Roberts said the tests were structured to see if a person could sustain endurance for two hours and function at a quasi-competitive level. Basically, he found that fifteen minutes was her maximum sustained competitive level of functioning, even at sedentary work. Although Cassie was able to complete each work sample, the scores she achieved were not at employable levels due to the duration of the tasks. Psychological screening showed she was not exaggerating her disabilities, and the fifteen-minute limitation was not based on any complaints from her, but on his observation of her during the testing process. Because of Cassie's physical limitations, he discontinued testing after three and one-half hours. Based on his tests and her physicians' poor prognosis for any improvement in her condition, Roberts said he did not perceive any hope that she would change to the point of being able to go out and do anything on a full-time basis, school or work. With the number of restrictions imposed by Dr. Broussard, he said there was no way to come up with a job and modify it enough to accommodate her condition. Although she might be able to work part-time, any such job would also have to allow her to function within those restrictions at a reasonably productive level, which was highly unlikely.
Cassie's mother, Jackie Barnes, said Cassie's life had been drastically altered by her injury. Before the accident, she had an active social life at school, was a cheerleader, played ball, and did all the normal things that young people do. Since then, she is unable to participate in any active play with her children. When Cassie travels the fifty-one miles to her mother's house, she is in such pain by the time she arrives that she has to lie down and rest before being able to visit. Cassie's daughter, Shelby, has to help her mother with many daily activities and with the younger children. Cassie also needs help from her mother-in-law and younger sister to keep up with housework. Her mother said:
[I]f she spends time with the kids and gives them a meal and takes them to school, she has to come home and lay down and rest so she can go back and get them .... She can't pick up lots of laundry. It's hard for her to mop and vacuum floors ... she can't get in the bathtub, clean the bathtub. She has me or Aunt Sylvia or Mrs. Peggy to do that for her. And simple things like making a flowerbed that most women do, she is not able to do that because she can't do the digging and bending and things of that nature.
Cassie's mother described her as a person who tries hard, but is simply unable to carry on normal activities due to pain.
The trial court explained his general damages award as follows:
This brings us to the question of general damages. There is no question in my mind this lady did suffer a disk *375 injury in this stumble and fall, trip and fall, or whatever you want to call it, that did result in surgery. It has also resulted in the formation of scar tissue on the nerve root which causes her additional problems. But the facts are that she continued to work at least in a part-time basis for an extended period after this injury and surgery; she conceived and bore and is raising two children since that time. She, according to Dr. Harkey, said that she had about four years where she had fairly good results and then started having more pain. And again, that was consistent with the time in which she became pregnant with her second child. So I recognize she has had problems since this surgery. I can imagine and certainly understand that her problems have gotten worse since she had the pregnancies and has had to deal with two young children. Dealing with two young children causes my relatively healthy back to hurt, so I can understand why she is having problems. But in any event, I award the sum of one hundred sixty-five thousand dollars in general damages for her injuries.
After reviewing the record in this case, we agree that the award of $165,000 was conservative, but cannot agree that it was an abuse of discretion. We must keep in mind the vast discretion given to the trial court in fixing general damages. As the court noted in Youn, 623 So.2d at 1261:
Many rational triers of fact could have decided that a [higher] award is more appropriate, but we cannot conclude from the entirety of the evidence in this record, viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." (citation omitted).
We cannot substitute our judgment for that of the trial court when, as in this case, the general damage award is within reasonable parameters. Therefore, we conclude that the award of general damages was not an abuse of discretion.

EXPENSES ASSESSED AS COURT COSTS
The judgment prepared by the parties and submitted to the trial court included a number of additional fees to be awarded as court costs. These had not been mentioned in the court's oral reasons, and before signing the judgment, the court struck through the following items:

Smart Corp., Jeff Anderson Hospital $ 37.96
Capital City Court Reporters, Dr. Thad Broussard $ 138.80
Allen & Associates, Drs. John Robinson & Dr. Louis Harkey $ 412.30
Smart Corp., OLOL Hospital $ 66.31
Video Productions, Greg Gomez $ 60.00
Phillips Court Reporting, Greg Gomez $ 160.00
Capital City Court Reporters, Dr. Thad Broussard $ 179.00

*376 According to Cassie's brief to this court, the parties had conferred and agreed that these items and amounts were to be included as court costs in the judgment. She asks this court to amend the judgment to award these additional costs.
The trial court or appellate court may award court costs in favor of a successful party and against the state or any political subdivision. See LSA-R.S. 13:5112; St. Tammany Parish Hosp. Svce. Dist. No. 2 v. Schneider, 00-0247 (La.App. 1st Cir.5/11/01), 808 So.2d 576, 589. These may include the costs of the clerk, sheriff, witness fees, costs of taking depositions, and copies of acts used on the trial. LSA-R.S. 13:4533. All of the above items were either the recording costs for depositions that were admitted into evidence or the costs for copying medical and hospital records that were admitted into evidence. Thus, all were "used on the trial." We find that these amounts were appropriate court costs to be awarded in favor of Cassie, as the successful litigant, and against the City/Parish, and we order the judgment amended accordingly.

CONCLUSION
The judgment is amended to award an additional $1,054.37 in court costs to Cassie, to be paid by the City/Parish. In all other respects, the judgment is affirmed. Costs of the appeal, in the amount of $4,623.92, are assessed against the City/Parish.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] Judge Ian W. Claiborne, retired from the Eighteenth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Other defendants were also added in supplemental and amending petitions, including Arzi's Lebanese Restaurant (Arzi's), a business that was being readied for operation in a building adjacent to the sidewalk where Cassie fell; Rostom Laymon, the owner of Arzi's; and Henry W. Darden, Jr., Margaret D. Browder, and Ruth Darden Rees (the Dardens), who owned the adjacent property. The Dardens filed a third-party demand against their lessee, Total Amusement Recreation Associates, d/b/a Gamemasters. All of these claims and demands were settled before trial.
[3] Cassie and her then-husband, Mark Williams, separated shortly after her surgery and were divorced; she has since remarried and has two more children with her current husband, Eddie Rolison. The trial court did not award any loss of consortium damages to Mark Williams, and he did not appeal.
[4] We recognize that LSA-R.S. 9:2800 currently requires actual or constructive notice of the defect as a prerequisite to claims against public entities such as the City/Parish for damages caused by the condition of things within its care and custody. However, the constitutionality of this statute was called into question as an abrogation of sovereign immunity contained in Article XII, § 10(A) of the Louisiana Constitution. Effective November 23, 1995, the constitutional provision was amended to allow the legislature to limit the liability of public entities, including the circumstances giving rise to liability. LSA-R.S. 9:2800 was then re-enacted, effective that same date, by 1995 La. Acts, No. 828. In Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14, the supreme court concluded that before the November 23, 1995 amendment to the constitution, the statute was unconstitutional. Additionally, because the reenactment of the statute was a substantive change in the law that altered the government's duty under Article 2317, the court concluded that LSA-R.S. 9:2800 could not be applied retroactively. Jacobs, 737 So.2d at 19. In the case we are reviewing, the accident took place on February 28, 1994, before the effective date of re-enacted LSA-R.S. 9:2800. As such, the statute is not applicable and Article 2317's legal fault principles, unmodified by LSA-R.S. 9:2800, govern our resolution of this case. See Dupree v. City of New Orleans, 99-3651 (La.8/31/00), 765 So.2d 1002, 1008 n.6.
[5] We note also that, in addition to the limitation of liability for public entities in LSA-R.S. 9:2800, strict liability has been effectively eliminated by the enactment of LSA-C.C. art. 2317.1, which provides for liability only with knowledge or constructive knowledge on the part of the owner or custodian of a defective thing. Article 2317.1, which became effective April 16, 1996, substantively changed the strict liability laws and does not apply retroactively. Thus, the earlier strict liability law still applies to claims that arose before the effective date of the 1996 legislation. Adams v. Parish of East Baton Rouge, 00-0424 (La. App. 1st Cir.11/14/01), 804 So.2d 679, 688 n. 6, writ denied, 02-0448 (La.4/19/02), 813 So.2d 1090.
[6] Klier testified, and it appears from some of the visual evidence, that the sidewalk was at one time only four feet wide all along Chimes Street and that the aggregate driveway was constructed so its curve met the northern edge of this four-foot-wide sidewalk. Later, the sidewalk was expanded to its present width; the portion in front of Arzi's was poured as a solid slab of brush-finished concrete that is five feet five inches wide. When this wider slab of sidewalk was constructed, the sidewalk was extended to meet the edge of the aggregate driveway north of the curved portion, forming the "quarter-circle" that is between the expansion joint and the driveway edge. Sometime later, the other crack occurred, forming the other "quarter-circle." Klier opined that the second crack and the depression of the semi-circular area of sidewalk was caused by the weight of vehicles hitting this area while using the driveway.
[7] Gomez had moved to Lawton, Oklahoma, and testified by video-taped deposition. His deposition was admitted at trial without opposition, because by that time, he was deceased.
[8] However, Brown also recalled that Cassie had told her the place where she fell was not on Chimes Street, but was around the corner where the sidewalk slopes down along the side of Arzi's. Though the court found Brown was a credible witness who "believes that that is what Ms. Williams told her," it also found the testimony of Cassie and Gomez established that the location of the fall was "in the area of the depressed concrete immediately outside of Arzi's."
[9] Article 2323 was amended by 1996 La. Acts, 1st Ex.Sess., No. 3, § 1, with an effective date of April 16, 1996. In Keith v. United States Fidelity & Guar. Co., 96-2075 (La.5/9/97), 694 So.2d 180, 183, the supreme court determined that the amendment to Article 2323 is procedural and can be applied retroactively.