781 So.2d 1 (2000)
Jenn-Tsai HUANG
v.
LOUISIANA STATE BOARD OF TRUSTEES FOR STATE COLLEGES AND UNIVERSITIES, the University of Southwestern Louisiana, Raymond Authement, President Gary Marotta, Academic Vice President Anthony Potter, Dean Donald Dareing, Chairman and Members of the College Tenure Committee.
No. 99 CA 2805.
Court of Appeal of Louisiana, First Circuit.
December 22, 2000.
*3 Alan Dabdoub, New Orleans, Counsel for Appellant Jenn-Tsai Huang.
Rickey Miniex, Rebekah Gallo, Lafayette, Counsel for Appellee Louisiana State Board of Trustees for State Colleges and Universities and the University of Southwestern Louisiana, Raymond Authement, President, Gary Marotta, Academic Vice President, Anthony Potter, Dean, Donald Dareing, Chairman and Members of the College Tenure Committee.
Before: WHIPPLE, FOGG and CRICHTON, JJ.[1]
SCOTT J. CRICHTON, J. Pro Tem.
This case presents the following issue for our resolution: whether the trial court erred in finding that Dr. Jenn-Tsai Huang failed to prove that the denial of his tenure was a violation of his constitutional rights to due process, equal protection, and to be free from discrimination based upon national origin and ancestry under the Fourteenth Amendment of the U.S. Constitution, Title VII (42 U.S.C. § 2000e et seq.), 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3) as well as Art. I, Sect. 12 of the Louisiana Constitution.[2] For the following reasons, we affirm the decision of the trial court.

FACTS AND PROCEDURAL BACKGROUND
Plaintiff, Dr. Jenn-Tsai Huang, filed suit against The University of Southwestern Louisiana, presently the University of Louisiana at Lafayette and the Louisiana *4 State Board of Trustees for State Colleges and Universities, Dr. Raymond Authement, President of USL, Dr. Gary Marotta, Academic Vice-President of USL, Dr. Anthony Ponter, Dean of the College of Engineering, Dr. Donald Dareing, Head of the Mechanical Engineering Department and members of the College Tenure Committee for denial of tenure allegedly based on national origin, in violation of 42 U.S.C. § 1981 and § 1983 as well as Article I, Section 12 of the Louisiana Constitution. Testimony and other evidence produced during a four-day bench trial reveal that the following are undisputed facts.
In September 1987, Dr. Jenn-Tsai Huang began teaching as Assistant Professor of Mechanical Engineering at The University of Southwestern Louisiana, presently the University of Louisiana at Lafayette (USL). Dr. John F. Stephens, III, then Chairman of the Mechanical Engineering Department had hired Dr. Huang on a probationary basis, which required yearly reappointments. Dr. Huang was not tenured but was on a tenure track. The faculty handbook provided for Huang's tenure determination as follows:
A faculty member appointed at the rank of Assistant Professor serves a probationary period not to exceed seven continuous years of full-time service. The faculty member will be evaluated during the sixth year of service to determine if he or she is considered to be eligible for tenure. At the end of the sixth year, the results of the evaluation will be made known to the faculty member.
Dr. Huang received three annual evaluations of "Good" (Category III) and three of "Very Good" (Category III*) for the years 1987 to 1992 and received yearly appointments from 1987 to 1993. Huang taught 31 sections of a total of over 500 students during his 6 years at USL. From March 1992 until August 1993, there were 8 student evaluations of Dr. Huang which the district court found to be a representative sample of the total number of students taught by Dr. Huang. Of the 77 students who answered in these 8 evaluations, 17 (approximately 22%) disagreed with the following statement about Huang: "in general the instructor presented material clearly enough for me to understand."
In March of 1993, Dr. Huang was reviewed for tenure. Dr. Donald Dareing, chairman of the Mechanical Engineering Department after Dr. Stephens, polled the Mechanical Engineering Departmental Tenure Committee for their recommendation concerning tenure for Dr. Huang. The departmental vote was unanimously against recommending tenure for Dr. Huang. The School of Engineering tenure committee voted six to one against tenure for Dr. Huang. Huang's annual evaluations were not reviewed by the tenure review committees. Dr. Anthony Ponter, Dean of the Engineering School evaluated the tenure application and recommended denial of tenure for Dr. Huang to Dr. Gary Marotta, Vice President of Academic Affairs. Dr. Marotta likewise evaluated the application and forwarded to USL's President, Dr. Raymond Authement, his recommendation against tenure. Dr. Authement, President of USL, agreed with the previous recommendations and formally denied tenure to Dr. Huang. Huang was notified that his employment was terminated, effective at the conclusion of the spring semester 1994. There is no indication that this termination breached Dr. Huang's annual contract provisions.
Yi-Yu Pan, Dr. Huang's wife, visited Dr. Dareing at his home to discuss the tenure decision. During their conversation, Dr. Dareing suggested that the Huangs return to work in their own country. Dr. Dareing also testified that (i) the graduate students *5 might tend to have more favorable comments about Dr. Huang because most of the graduate students were Chinese and Indians and that (ii) the undergraduate course evaluations would be more of a measure of the quality of his teaching than the graduate course evaluations.
Dr. Huang appealed to the Faculty Welfare Committee, a committee comprised of professors from various colleges at USL, which functions as a reviewing body for grievances made by professors. On October 11, 1993 that committee wrote to Dr. Authement that they had concluded their investigation and found no grounds for reversing the decision to deny tenure.
Dr. Huang filed suit against the forementioned defendants and the parties presented evidence during a four day bench trial. The district court ruled in favor of the defendants dismissing Dr. Huang's claims at his cost. Dr. Huang appeals, asserting that the district court erred in that it made incorrect factual findings and conclusions of law and made unreasonable evaluations of credibility. Huang specifically asserts as error the district court's conclusion that 42 U.S.C. § 1981 and 42 U.S.C. § 1983 were not violated under the facts and circumstances of this case and claims that the district court misapplied Chung v. Morehouse College, 1975 WL 292 (N.D.Ga.1975). Finding no reversible error, we affirm the district court judgment.

LAW AND DISCUSSION:

STANDARD OF REVIEW
The Louisiana Supreme Court has announced a two-part test in which the appellate court must find the following for the reversal of a factfinder's determinations: (1) there is no reasonable factual basis from the record for the finding of the trial court, and (2) the record establishes that the finding is clearly wrong (manifestly erroneous). Cormier v. Comeaux, 98-2378 (La.07/07/99), 748 So.2d 1123, rehearing denied (La.9/3/99), citing Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding: there must be a review of the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. This is because
[t]he appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
Rosell v. ESCO, 549 So.2d 840, 843 (La. 1989). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cormier, supra, at 1127.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable *6 fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell v. ESCO, supra, 549 So.2d at 844-845, citations omitted.
A judgment and reasons for judgment are two separate and distinct legal documents and appeals are taken from the judgment, not the written reasons for judgment.[3] LSA-C.C.P. art. 1918. Ziegel v. South Cent. Bell, 93-547 (La.App. 5 Cir. 03/16/94), 635 So.2d 314. The court of appeal reviews judgments and, where the court of appeal believes that the trial court reached the proper result, the judgment will be affirmed. Id., citations omitted. Accordingly, even if the trier of fact erred in findings of fact, we are constrained to affirm the judgment if the judgment is reasonable in light of the record as a whole.

APPLICABLE LAW
The four criteria sufficient to establish prima facie case of discrimination based on circumstantial evidence are set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) as follows:
1. The plaintiff belongs to a protected class.
2. The plaintiff was qualified for a particular position.
3. The plaintiff was discharged from the position.
4. The plaintiff was replaced by a non-minority.
After a case has been fully tried on the merits, the inquiry on appeal becomes whether the record contains sufficient evidence to support the conclusions reached by the trier of fact. Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927 (5th Cir. 1996), cert. denied, 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). Dr. Huang asserts violations of his constitutional rights under 42 U.S.C. § 1981, 42 U.S.C. § 1983 and Article I, Section 12 of the Louisiana Constitution, all of which make it illegal to discriminate on the basis of national ancestry. These statutes, as well as the Louisiana Constitution, prohibit disparate treatment of employees. Disparate treatment exists when the employer treats some employees less favorably because of their race, color, religion, sex or national origin. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).
The elements of the Title VII claim[4] and the § 1983 *7 claim[5] are identical. Tanik, 116 F.3d 775, 775-776 (5th Cir.1997) citation omitted. "To establish a prima facie case of discrimination in the context of a denial of tenure, the plaintiff must show that: (1) he belongs to a protected group, (2) he was qualified for tenure, and (3) he was denied tenure in circumstances permitting an inference of discrimination". Tanik v. Southern Methodist University, cert. denied, 522 U.S. 1015, 118 S.Ct. 600, 139 L.Ed.2d 488 (1997).
Establishment of a formal tenure process generally "precludes a reasonable expectation of continued employment" for non-tenured faculty. Spuler v. Pickar, 958 F.2d 103 (5th Cir. 1992).
The tenure processfrom the initial recommendations of the candidates by the professoriat to the ultimate review by university administrators and members of the Board of Regentsis intrinsically subjective. Such a determination is not readily scrutinized in the adversarial judicial forum.
Spuler, supra. The United States Fifth Circuit and other federal circuits have recognized that
... tenure decisions in colleges and universities involve considerations that set them apart from other kinds of employment decisions. Those factors are: (1) tenure contracts require unusual commitments as to time and collegial relationships, (2) academic tenure decisions are often non-competitive, (3) tenure decisions are usually highly decentralized, (4) the number of factors considered in tenure decisions is quite extensive, and (5) tenure decisions are a source of unusually great disagreement.
Tanik, supra, (citations omitted). This does not mean, however, that tenure decisions are exempt from judicial scrutiny. Id. A plaintiff may be able to prove a Title VII violation by a showing of facts such as (i) departures from procedural regularity, (ii) conventional evidence of bias on the part of individuals involved, or (iii) that the plaintiff is found to be qualified for tenure by some significant portion of the departmental faculty, referrants or other scholars in the particular field. See Tanik, supra, quoting Zahorik v. Cornell University, 729 F.2d 85, 92-93 (2nd Cir.1984).
In order to establish a prima facie case under section 1981, a plaintiff must produce direct or circumstantial evidence of purposeful discrimination by the defendant.[6]Ramirez v. Sloss, 615 F.2d *8 163, 168 (5th Cir.1980). If the plaintiff presents direct evidence of discrimination, the defendant bears the burden of establishing by a preponderance of the evidence that the defendant would have made the same decision in the absence of the illegitimate factor. Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

DISCUSSION
Dr. Huang belongs to a protected class;[7] he was denied tenure and discharged from his position. However, the overwhelming evidence, as determined by the trial court, was that he was not qualified for his particular position inasmuch as he could not effectively communicate in English; his research was of an inadequate level; and his public service achievements were minimal, if any. Based upon the undisputed facts, the record reveals that Dr. Huang has not proven that there was discrimination on the basis of his national origin or ancestry. While we do not find error in the findings of the trial court, even if we were to assume, arguendo, that the factual findings of the trial court were incorrect, our review of the record shows that the judgment of the trial court was reasonable simply because of the dearth of evidence of unconstitutional discrimination.
There is not a scintilla of evidence of direct discrimination. Every witness testified that there were no comments made at any level of the tenure process regarding race or national origin. When we view the disputed facts most favorably to Dr. Huang, we see that Dr. Dareing suggested (i) that the Huangs return to their own country and (ii) that undergraduate course evaluations were a better measure of the quality of teaching because most of the graduate students were Chinese and Indians. However, Dr. Dareing did not make the ultimate decision about tenure. There were no other Taiwanese professors employed within USL's Mechanical Engineering Department during the six years Huang was there. However, there was one Taiwanese professor in the College of Engineering. Huang has identified, and we have found, no other evidence that his tenure decision was solely based upon unconstitutional discrimination.
In Krystek v. University of Southern Mississippi, 164 F.3d 251 (5th Cir.1999), Krystek, a non-tenured assistant professor on a tenure track, went up for tenure in 1994 and his department voted for tenure but against promotion. One of Krystek's supporters, an interim dean, met with him and encouraged him to publish more articles. When Krystek complained that a female assistant professor had gotten tenure with a similar publication history during her employment with the university, the interim dean told Krystek that there are different standards for males and females. A jury found in favor of Krystek. On appeal, however, the U.S. Fifth Circuit Court of Appeal found that the comment *9 by the interim dean was, at most, a stray remark in the workplace. Krystek, supra at 256. The court reasoned that, in order for comments in the workplace to provide sufficient evidence of discrimination, they must be (i) related to the protected class of persons of which the plaintiff is a member, (ii) proximate in time to the terminations, (iii) made by an individual with authority over the employment decision at issue, and (iv) related to the employment decision at issue. Krystek, supra at 256, quoting Brown v. CSC Logic, Inc., 82 F.3d 651 (5th Cir.1996).
In the instant case, as in Krystek, the comments about the Huang's future location and about the course evaluations were made by someone who was far removed from the final decision to grant tenure and are not probative evidence that the school's decision in Huang's case was motivated by race. Cf. Krystek, 164 F.3d at 256.
Regarding the department demographics, Exhibit 12 provides a listing of professors, their national origin, as well as their tenure position. We find that the trial court adequately and sufficiently analyzed this subject in its written reasons, and we quote the court's findings as follows:
The Mechanical Engineering Department had 7 members, including Dr. Huang, when he was terminated. Dr. Elsayed (who switched courses with Huang in 1988) is from Egypt. The other 5 are from the United States. In the Engineering Department as a whole, there were 40 professors whose national origin is as follows:
USA26 Taiwan4 England1
Iran3 Turkey1 Greece1
India2 Egypt1 Nigeria1
Thus, 35% of the engineering faculty are from countries other than the United States.
The statistics for granting tenure indicate that between 1983 and 1993 there were 27 applicants for tenure; 20 were approved and 7 were denied. The country of origin of these were as follows:

 Approved Disapproved
USA 15 4
India 1 0
Iran 2 0
Venezuela 0 2
Egypt 1 0
Taiwan 0 1
Judia (sic) 1 0

In 1994 there were 3 applicants for tenure; 1 from Taiwan was recommended, 1 from USA was recommended, 1 from USA was not recommended.
At the time of his termination there were three additional faculty members in the College of Engineering from China: Dr. R.S.C. Wang in Civil Engineering who was tenured, Dr. Jim Lee in Industrial Management who had been recommended for tenure, and Dr.C.S. Fang in Chemical Engineering who is not referenced in the evidence as to his tenure status.
According to the record, the reasons USL denied Dr. Huang's tenure application included his inability to communicate in English and his ineffectiveness as a teacher. The trial court found that, ultimately, Dr. Huang was evaluated for tenure by 24 faculty members, 23 of whom recommended against tenure and found no grounds to reverse the decision not to grant tenure. Although no written reasons for denial of tenure were provided by USL, it has contended that Dr. Huang's denial of tenure was based primarily on his inability to communicate effectively in English, a deficiency which greatly diminished his teaching ability; moreover, his research, while at USL, was not of a standard and frequency expected of professors in the College of Engineering on the tenure track.
*10 Dr. Huang asserts that USL acted arbitrarily and unreasonably and in denying him tenure and that the stated reasons were merely a pretext for national origin discrimination. He strenuously contends that USL arbitrarily ignored the faculty handbook in the tenure review.[8] Moreover, he argues that objective evidence such as the annual performance evaluations and other documents (such as the positive course evaluations from a large percentage of his students) so contradict the factual findings of the trial court that the trial court findings and resultant conclusions are manifestly erroneous. Huang contends that these performance and course evaluations are proof the asserted reasons for his tenure denial and termination are false and unconstitutionally discriminatory. According to Dr. Huang, his six years of reappointments and the comments in his performance evaluations prove that (i) the USL reasons for its action against him, as well as (ii) the trial court's findings, are internally inconsistent or implausible on their face. Therefore, according to Dr. Huang, a reasonable fact finder would not credit the testimony and reasons for the tenure decision presented by USL and would conclude that he was denied tenure because of national origin discrimination. We disagree.
Implicit in the status of a nontenured/probationary employee is the assumption that protection against arbitrary or repressive dismissal is absent, i.e., the *11 doctrine of employment at will prevails. Schwartz v. Administrators of the Tulane Educational Fund, 97-0222 (La.App. 4 Cir.1997), 699 So.2d 895, 898. Louisiana recognizes the doctrine of "employment at will" and, absent a contractual relationship, the reasons for termination need not be accurate, fair or reasonable. Mix v. University of New Orleans, 91-2720 (La.App. 4 Cir. 11/24/92), 609 So.2d 958, 960, 964. For these reasons, the accuracy or inaccuracy of the perception that Dr. Huang was not an effective teacher is immaterial and probative only on the question of pretext. As discussed above, the record does not reveal a discriminatory motive, or any other discrimination, based upon national origin or ancestry. Accordingly, we do not even reach the question of whether the reasons for denial of tenure stated by USL were pretextual. Moreover, even were we to assume arguendo that USL's stated reasons were false, that the objective evidence shows that Dr. Huang was a highly qualified and effective teacher eligible for tenure, it does not follow that the reason he was denied tenure was based upon his national origin or ancestry.
Finally, Dr. Huang has complained that the court has misapplied the ruling in Chung v. Morehouse College, 1975 WL 292 (N.D.Ga.1975). We disagree with Dr. Huang's assertion that the trial court misapplied Chung. The Chung case is factually similar to the instant matter with the exception that in Chung there were racial remarks made by the administration regarding the fact that Dr. Chung was of Chinese origin and, thus, in Chung there was some direct evidence of discrimination. In contrast, there were never any racial remarks regarding nationality; thus, application of Chung and its rationale to the facts of this matter leads to an even sounder conclusion adverse to the position taken by Dr. Huang.
Although not argued in Dr. Huang's counseled briefs, his pro se brief mentions that USL has no discretion to violate his rights to constitutional due process. The due process clause protects against arbitrary deprivation of both property and liberty interests. Wells v. Doland, 711 F.2d 670 (5th Cir.1983). If there is no protected property interest, there is no process due, i.e., the status is employment at will, modified by annual contracts. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 568, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Dr. Huang had no property interest in the possibility of tenure. Moreover, the facts herein do not show that he has a liberty interest sufficient to implicate the fourteenth amendment's safeguards.[9]

*12 CONCLUSION

For the foregoing reasons, we find that the record reveals evidence from which a fact finder could reasonably conclude that the decision of USL to deny tenure was not based on Dr. Huang's national origin or ancestry. Accordingly, the trial court's judgment is affirmed. Costs of this appeal in the amount of $5,100.07 are assessed to the appellant, Dr. Jenn Tsai Huang.
AFFIRMED.
NOTES
[1] First Judicial District Court Judge Scott J. Crichton assigned pro tempore by order of the Supreme Court of Louisiana.
[2] Dr. Huang initially represented himself in this appeal during which time he filed pro se original and supplemental briefs with this court. Thereafter, appellate counsel was retained and a motion for leave to file a supplemental brief was granted by this court. The brief by counsel addresses issues under 42 U.S.C. §§ 1981 and 1983 and Article I, Section 12 of the Louisiana Constitution. The pro se briefs make reference to constitutional rights to due process and against discrimination; however, Huang has neither briefed nor argued his § 1985 claim; we therefore deem it abandoned. Louisiana Uniform Rules Courts of Appeal, Rule 2-12.4; Devers v. Southern University, 97-0259 (La.App. 1 Cir. 4/8/98), 712 So.2d 199, 207; White v. GMC, 99 CA 2585 (La.App. 1 Cir.11/03/00), 775 So.2d 492, 503, n. 21.
[3] See also, Falkowski v. Maurus, 92-0102 (La. App. 1 Cir. 9/9/93), 637 So.2d 522, writ denied, 93-2579 (La.12/20/93), 629 So.2d 1176; reconsideration denied, 93-2579 (La.1/28/94), 631 So.2d 1168. ("An appeal is taken from a final judgment, not from reasons for judgment which are the trial court's explanations of determinations made. However, it is not improper for the court of appeal to consider written reasons for judgment in determining whether the trial court erred.")
[4] 42 U.S.C. § 2000e-2 proscribes unlawful employment practices, in pertinent part, as follows:

(a) Employer practices. It shall be an unlawful employment practice for an employer
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
[5] 42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.... For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
[6] 42 U.S.C. § 1981 provides in pertinent part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
[7] Although § 1981 does not itself use the word "race," the Court has construed the section to forbid all "racial" discrimination in the making of private as well as public contracts. Saint Francis College v. Al-Khazraji, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 rehearing denied, 483 U.S. 1011, 107 S.Ct. 3244, 97 L.Ed.2d 749 (1987). Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory.
[8] This argument is without merit for two reasons. First, it is not true. Huang argues that the faculty handbook says that performance evaluations are the basis for tenure recommendations. The USL faculty handbook, in pertinent part provided as follows:

Tenure
A faculty member appointed at the rank of Assistant Professor serves a probationary period not to exceed seven continuous years of full-time service. The faculty member will be evaluated during the sixth year of service to determine if he or she is considered to be eligible for tenure. At the end of the sixth year, the results of the evaluation will be made known to the faculty member.
Promotions
Academic ranks at the University are Instructor, Assistant Professor, Associate Professor, and Professor. Advancement in academic rank is not automatic, but is based upon the performance of a faculty member and the recommendation of the department head to the appropriate academic dean, who transmits it with a recommendation, to the Academic Vice President, who in turn submits it to the President.
In recommending a faculty member for promotion in rank, the department head must consider such factors as 1. Effectiveness as a teacher; 2. Professional attainments, such as research, continued study and the earning of an advance degree, publications and participation in professional societies; and 3. Service to the department, college, and University. Annual "Performance Evaluations" of a faculty member form the basis for the judgments concerning teaching, professional attainments, and service to the department, college, and University which must be made by the University administration in considering recommendation for promotion (Emphasis added)
We note that the decision whether to award tenure is not necessarily the same as the decision whether to promote. Thus, the handbook does emphasize the importance of performance evaluations but it does so on the question of promotion and not on the question of tenure. See Krystek, supra, ("the department recommended him for tenure but not for promotion.")
The second reason we find meritless Dr. Huang's argument that USL ignored the faculty handbook is that, even if this assertion were true, Huang had no property right or liberty interest in tenure, therefore USL was free to deny tenure for any reason that was not unconstitutionally discriminatory. See Mix v. University of New Orleans, 91-2720, (La.App. 4 Cir. 11/24/92)[,] 609 So.2d 958, 964, writ denied, 612 So.2d 83 (La.1993). ("... a determination of whether [company policies and procedures] were properly followed is irrelevant ....")
[9] See Wells, 711 F.2d at 676 (citations omitted) where the U.S. Fifth Circuit found that,

[t]o establish a liberty interest sufficient to implicate the fourteenth amendment's safeguards, the employee must show not only that he has been stigmatized,7 but that he was stigmatized in or as a result of the discharge process, that the charges were made public,8 and that he was denied a meaningful hearing to clear his name. (citations omitted).
7. Inherent in this requirement is a finding that the charges not only seriously damaged the employee's standing and association in the community or foreclosed his freedom to take advantage of other employment opportunities, but that the charges are false. Codd v. Velger, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977).
8. Ortwein [v. Mackey, 511 F.2d 696, 699 (5th Cir.1975)] discussed this court's en banc holding in Sims v. Fox, 505 F.2d 857, 864 (5th Cir.1974) (en banc) that the mere presence of derogatory information in confidential files does not infringe an individual's liberty interest and stated the corollary that infringement of one's liberty interest is found only where the governmental agency has made or is likely to make the allegedly stigmatizing charges public "in any official or intentional manner, other than in connection with the defense of related legal action." Ortwein, 511 F.2d at 699.