864 So.2d 234 (2003)
Janice Cantrell O'CONNOR and George J. O'Connor, Jr.
v.
Elmer LITCHFIELD, Sheriff, East Baton Rouge Parish.
No. 2003 CA 0397.
Court of Appeal of Louisiana, First Circuit.
December 31, 2003.
Rehearing Denied February 9, 2004.
*237 William T. Lowrey, Jr., Baton Rouge, Counsel for Plaintiffs/Appellees Janice Cantrell O'Connor and George J. O'Connor, Jr.
Leu Anne Lester Greco, Baton Rouge, Counsel for Defendant/Appellant Elmer B. Litchfield, Sheriff East Baton Rouge Parish.
Before: WHIPPLE, KUHN, and MCDONALD, JJ.
KUHN, J.
Defendant-appellant, Elmer Litchfield in his capacity as the Sheriff of East Baton Rouge Parish (the Sheriff), appeals the trial court's judgment awarding damages in survival and wrongful death actions in favor of plaintiffs-appellees, Janice O'Connor and George O'Connor, Jr., the surviving widow and son of deputy lieutenant George O'Connor, Sr. (Lt.O'Connor). The O'Connors answer the appeal. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
On April 2, 1997, Lt. O'Connor, a longterm employee of the East Baton Rouge Sheriff's Office, was working as a shift lieutenant at the Kleinpeter Substation when he slipped and fell on a wet floor which had recently been mopped by a trustee/inmate who had been transported to the substation by sheriff deputies for the purpose of performing maintenance of the premises. Lt. O'Connor initially thought he had merely sprained his ankle but when the swelling had not abated, at the direction of his supervisor, he sought medical attention. After x-rays were taken, Lt. O'Connor was advised that he had sustained an ankle fracture. Because he experienced continued weakness in his right leg, his treating physician referred him to a neurologist, Dr. Steven Zuckerman. Based on continued complaints of muscle weakness, as well as difficulty with speaking and swallowing, Dr. Zuckerman concluded that some of Lt. O'Connor's symptoms could be explained in part by a disc herniation with compression on his cervical spinal cord. Dr. Zuckerman referred Lt. O'Connor to a neurosurgeon who performed surgery on Lt. O'Connor's cervical spine in March 1998.
Lt. O'Connor filed this lawsuit against his employer in March 1998 seeking redress for injuries to his ankle, neck, and *238 head. Despite the March 1998 surgery, Lt. O'Connor continued to experience the symptoms for which he had been referred to Dr. Zuckerman: muscle weakness as well as an increased inability to speak and swallow. After consultation with experts in Houston, Texas, on May 13, 1998, Dr. Zuckerman diagnosed Lt. O'Connor with Amyotrophic lateral sclerosis (ALS).[1] On December 28, 1998, Lt. O'Connor died.
On December 16, 1999, Janice O'Connor and George O'Connor, Jr., supplemented the earlier-filed petition, substituting themselves as proper-party plaintiffs and averring entitlement to damages for the survival action and wrongful death of Lt. O'Connor.[2] After a two-day trial, the trial court awarded $404,894.83 for the survival action. Awards of $300,000 in favor of Janice and $200,000 in favor of George were made for their respective wrongful death claims. Costs were assessed against the Sheriff. From the judgment signed on October 9, 2002, the Sheriff appeals.
On appeal, the Sheriff challenges the trial court's liability conclusion; apportionment of fault; failure to reduce the amount of medical damages awarded in the survival action for payments and write offs made by the employer for Lt. O'Connor's medical expenses; and failure to statutorily limit the O'Connors' total recovery to $500,000. In their answer, the O'Connors aver the trial court's failure to render awards to each of them for loss of consortium damages constitutes reversible error.

LIABILITY[3]
The parties do not disputed that in this lawsuit although the Kleinpeter Substation was outfitted with orange warning cones that cautioned of the wet condition of the floor, at the time and place of Lt. O'Connor's fall, these devices were not in place. According to the testimony of all the witnesses, it was the responsibility of a trustee, transported by deputy sheriffs in the early morning hours from the prison, to mop the floor of the Kleinpeter Substation. Skip D'Amico, the captain to whom charge of the substation was delegated by the Sheriff at the time of Lt. O'Connor's slip and fall, testified that proper standard operational procedure at the Kleinpeter Substation required the trustee who mopped the floor to position warning cones in any areawhether accessible to the public or only to the Sheriff's employeesto notify those who might use the floor of its wet condition. D'Amico explained that in 1984 or 1985 when the trustee premises maintenance program was initiated at Kleinpeter Substation, he verbally advised all the shift lieutenants, including Lt. O'Connor, of the proper procedure to which the trustees were to adhere. Specifically, D'Amico said, shift lieutenants were told that the trustee was expected to place warning cones in a recently mopped area while the floor was wet. Noting the frequent change of the individual trustee sent to Kleinpeter Substation from the prison, *239 D'Amico stated that he additionally had the instructions typed up for the trustee to see, and these were posted in the back of the room that the trustees used. The matter was never discussed again until subsequent to Lt. O'Connor's slip and fall.
Neither a copy of the posted instructions nor testimony of a shift lieutenant, or any other person who had received D'Amico's verbal instruction that a trustee was to place warning cones, was introduced into evidence. The trustee who actually mopped the floor upon which Lt. O'Connor fell on April 2, 1997, was never identified and, therefore, his testimony was not placed into the record.
A court of appeal may not reverse the trial court's factual finding unless it is manifestly erroneous or clearly wrong. Stobart v. State of Louisiana, Through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993). The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id.
According to La. R.S. 23:13:
Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations.
In order for an employee to recover from the Sheriff, plaintiffs must prove, among other things, that the accident and injuries were caused by an unreasonable risk of harm created by the employer's failure to properly fulfill the duties imposed by La. R.S. 23:13. Gorton v. Ouachita Parish Police Jury, 35,432, p. 17 (La.App.2d Cir.4/3/02), 814 So.2d 95, 104, writs denied, 02-1261, 02-1273 (La.8/30/02), 823 So.2d 950, 952.
Expressly noting and relying upon the testimony of safety expert, Michael Frenzel, in its written reasons for judgment, the trial court concluded that the housekeeping procedures of the Sheriff's Office were not properly disseminated from the Sheriff through the ranks down to the shift lieutenants in charge of the substation building, including Lt. O'Connor who, as the Sheriff's ranking officer at the time of his injury, was in charge of the Kleinpeter substation. The written reasons state that the trial court:
does not find that the duty to maintain a safe working environment at the Kleinpeter Substation was delegated to Lt. O'Connor [as argued by defendant]. No evidence was submitted that Lt. O'Connor's duties included monitoring the housekeeping tasks performed by the trustees.
The trial court assessed "100% of the fault and liability" against the Sheriff.
Sheriff's Failure to Properly Fulfill Duties under La. R.S. 23:13
While D'Amico testified that he had instructed the shift lieutenants of the general *240 responsibilities of the trustees in 1984 or 1985, he admitted that the Sheriff had not given him or any other supervisor training or instructions to oversee the trustees' work. This record establishes that D'Amico was the person who fashioned and posted instructions for Kleinpeter Substation. By D'Amico's account, the instructions he drafted were directed to the trustees and not to the shift lieutenants or deputies who worked at the substation. Although the Sheriff had a written manual addressing generalization of the operations of a substation, D'Amico testified that the manual did not include a procedure addressing the maintenance duties the trustees were to perform on the premises. While other Kleinpeter Substation employees who testified indicated that they knew to summon the trustee to tend to a mess or to request that a garbage basket be emptied, none knew of specific requirements to which the trustee was expected to conform in accomplishing the maintenance detail and specifically insofar as mopping the floors of the substations.
Safety expert Frenzel testified to the need for uniformity and consistencies as to how trustee labor was used in a janitorial setting. In light of the high turnover rate at the Kleinpeter Substation, Frenzel opined that D'Amico's posted instructions were not sufficient for safety purposes without someone employed at the Kleinpeter Substation ensuring that the trustee actually saw, understood, and adhered to them. Based on safety journals and texts, Frenzel stated that it was the custom of the janitorial/custodial services industry to set out cones and some other type of safety devices during the time that a floor was mopped warning of the wet condition. He said that the warnings should be posted while the floor was wet until it was fully dry. And then to prevent a false warning, the safety devices needed to be removed.
We find a reasonable factual basis exists to support the trial court's conclusion that the Sheriff failed to disseminate a standard operational procedure to either the trustees to whom substation maintenance duties had been delegated or to the deputies charged with their supervision. This conclusion, therefore, is not manifestly erroneous. The Sheriff, as Lt. O'Connor's employer, simply failed to adopt and use methods and processes reasonably adequate to render the Kleinpeter Substation safe in derogation of his duty under La. R.S. 23:13. The trial court correctly concluded that the Sheriff failed to properly fulfill the duties imposed by La. R.S. 23:13.
Predicated on the factual finding that the Sheriff failed to disseminate a standard operational procedure to either the trustees insofar as their obligations in performing the maintenance detail at the Kleinpeter Substation, including the trustee who mopped the floor upon which Lt. O'Connor fell; or to the shift lieutenants in charge of Kleinpeter Substation insofar as their supervising duties over the trustees, in order to impose liability directly against the Sheriff under La. R.S. 23:13, the jurisprudence nevertheless requires a showing that the failure to place the cones warning of the wet condition of the recentlymopped floor constitutes an unreasonable risk of harm, which caused the damages that the O'Connors sustained. See Gorton, 35,432 at p. 17, 814 So.2d at 104.

Unreasonable Risk of Harm
In concluding that the Sheriff was liable to the O'Connors for failing to fulfill his duties under La. R.S. 23:13, the trial court implicitly found that the lack of cones on the recently-mopped floor warning of the wet condition constituted an unreasonable risk of harm.
Whether a defendant's liability has been based on a theory of strict liability *241 or negligence,[4] the jurisprudential criterion for determining an unreasonable risk of harm requires a balancing of the likelihood and magnitude of harm against the utility of the thing, as well as a broad range of social, economic, and moral factors, including the cost to the defendant of avoiding the harm, and the risk and the social utility of the plaintiff's conduct at the time of the accident. All the circumstances surrounding the particular accident under review must be carefully considered to determine whether allowing recovery to the particular plaintiff involved, for damages occurring in the particular manner in which the plaintiff was injured, is desirable from the standpoint of justice and the social utility of the conduct of the respective parties. Adams v. Parish of East Baton Rouge, 00-0424, pp. 11-12 (La.App. 1st Cir.11/14/01), 804 So.2d 679, 690, writ denied, 02-0448 (La.4/19/02), 813 So.2d 1090.
According to safety expert Frenzel, the placement of cones serves as a subconscious reminder to modify the way a person walks to accommodate for the wet floor. In the employment context, where an employee has traversed a wet floor but has subsequently had his mind occupied with employment-related matters, placement of warning cones alerts the mind of the still-wet condition of the floor.
In this case, it is undisputed that the Kleinpeter Substation was outfitted with orange warning cones that cautioned of the wet condition of the floor. And the evidence established the trustees regularly set the warning cones out when mopping the lobby portion of the substation, which was an area accessible to the public. Thus, the cost to the defendant of avoiding the harm was minimal. Injuries to a person who slips and falls on a wet floor are the obvious risk of harm that placement of warning cones is designed to minimize.
In slip and fall claims based on negligence, defendant's awareness of the dangerous condition of the premises gives rise to a duty to act, see Oster v. Dep't of Transp. & Dev., 582 So.2d 1285, 1288 (La. 1991), which includes the duty to warn third persons of the hazard. See e.g. Stevens v. Winn-Dixie of La., 95-0435, pp. 6-7 (La.App. 1st Cir.11/9/95), 664 So.2d 1207, 1212 (duty of care under Product's Liability Act, see La. R.S. 9:2800.6, included duty to warn of wet condition of floor due to recently-mopped hallway in store); Carr v. City of New Orleans, 626 So.2d 374, 380 (La.App. 4th Cir.1993), writ denied, 94-0062 (La.3/11/94), 634 So.2d 398 (janitorial service has duty to take precautionary measures to warn users of facility of potential hazards).
We find no error in the trial court's implicit conclusion that the failure to set out cones warning of the wet condition of the recently-mopped floor in the hallway where Lt. O'Connor's office was located constituted an unreasonable risk of harm, which created an unsafe place of employment as contemplated by La. R.S. 23:13.

Causation
To impose liability against the Sheriff under La. R.S. 23:13 in accordance with the jurisprudence, see Gorton, 35,432 at p. 17, 814 So.2d at 104, the record must also include evidence that the failure to post the warning cones was the cause of the accident and injuries.[5]
*242 Cause-in-fact is generally a "but for" inquiry. Hughes v. Goodreau, 01-2107, p. 18 (La.App. 1st Cir.12/31/02), 836 So.2d 649, 662, writ denied, 03-0232 (La.4/21/03), 841 So.2d 793. Thus, the cause-in-fact inquiry is whether the harm to the O'Connors would have occurred but for the failure to properly mark the floor with cones. Causation is a question of fact. Conerly v. State of Louisiana ex rel. the Louisiana State Penitentiary and the Dep't of Corrs., 02-1852, pp. 10-11 (La. App. 1st Cir.6/27/03), 858 So.2d 636, 645-47, writ denied, 03-2121 (La.11/14/03), 858 So.2d 432.
Corporal R.B. Carney, the Kleinpeter Substation radio dispatcher, and Deputy Jennifer Sebella, who performed secretarial duties at the substation, both testified that Lt. O'Connor had exited the communications room to answer a ringing phone in his office. The Sheriff employees' memories of the pace at which Lt. O'Connor traveled down the hallway to his office were not in conformity: Carney recalled that the shift lieutenant ran; but Sebella testified that Lt. O'Connor walked as he returned to his office.
Mindful of safety expert Frenzel's testimony that the placement of cones served as a general reminder to all to modify their manner of walking to accommodate the wet condition of the floor; and that insofar as an employee at work who has traversed a wet floor, the cones reminded him of its still-wet condition despite any subsequent mental concerns he may have had with employment-related matters, we cannot say that the trial court is clearly wrong in concluding that the lack of properly-positioned cones caused the losses the O'Connors sustained. But for the lack of cones warning him, Lt. O'Connor would have been duly alerted of the need to modify his method of traversing the hallway as he went to answer the ringing phone in his office. Because Lt. O'Connor died prior to the trial of this matter, his testimony on this point was not produced. But it is obvious that the conclusion that the wet condition of the floor and the failure to properly display the warning cones caused this slip and fall which ultimately resulted in Lt. O'Connor's death is a reasonable one based on our review of the entirety of this record. See and compare Stevens, 95-0435 at p. 7, 664 So.2d at 1212 and Carr, 626 So.2d at 380.
The Sheriff failed to fulfill his duty under La. R.S. 23:13 to adopt and use methods and processes reasonably adequate to render Lt. O'Connor's place of employment safe. And the evidence duly demonstrated that the failure to place cones warning of the wet condition of the recently-mopped floor constituted a reasonable method or process which would have adequately rendered the Kleinpeter Substation hallway safe. As required by the jurisprudence, the record also establishes that the lack of cone placement on the wet floor created an unreasonable risk of harm which caused the accident to Lt. O'Connor. Accordingly, under La. R.S. 23:13, and the jurisprudence interpreting this statutory duty, we find that the trial court correctly imposed liability for the O'Connors directly against the Sheriff.[6]

*243 COMPARATIVE FAULT
The Sheriff urges that the trial court erred in failing to apportion some fault on Lt. O'Connor, maintaining that Lt. O'Connor's failure to have cones placed on the wet floor of the hallway in that portion of the Kleinpeter Substation which was inaccessible to the public requires that some fault be attributed to the shift lieutenant. The Sheriff also contends that Lt. O'Connor's failure to use due care when he traveled down the hallway to answer the ringing phone also supports a finding that he is comparatively at fault in causing the damages the O'Connors have sustained.
Louisiana Civil Code article 2323 A provides in relevant part:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined.... If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement v. Frey, 95-1119, 95-1163, p. 8 (La.1/16/96), 666 So.2d 607, 611.
A determination of the allocation of fault by the trier of fact is a factual finding, which cannot be overturned in the absence of manifest error. Williams v. City of Baton Rouge, 02-0682, p. 12 (La. *244 App. 1st Cir.3/28/03), 844 So.2d 360, 371. Thus, we must determine whether the fact finder's conclusion was a reasonable one, not if the trial court was right or wrong. Id., 02-0682 at pp. 12-13, 844 So.2d at 371.
Addressing the Sheriff's contention that Lt. O'Connor bears responsibility for having failed to properly direct the trustee to place the cones on the recentlymopped, wet floor, the trial court found that D'Amico's oral notice to shift lieutenants, including Lt. O'Connor, once in 1984 or 1985 was insufficient dissemination of the trustees maintenance detail duties. While the record supports the finding that the typewritten instructions were posted in the back of the room used by the trustees, none of the Sheriff's deputies who testified were aware of what information was included in them. Additionally, Sebella's testimony that she had seen cones used in the areas inaccessible to the public once or twice established that any use of cones in that area of the substation was irregular.
We cannot say that the trial court's determination that the Sheriff was in the position to best ensure that procedures were adhered to at the Kleinpeter Substation, including the simple, low-cost measure of setting out warning cones. Indeed, a sheriff-authorized operational procedure addressing the execution of maintenance detail, including janitorial services, would ensure the safety of his employees in the other substations and facilities where his employees regularly work, thereby diverting the risks inherent in temporarily wet floors, among other things. As noted by safety expert Frenzel, it is expected that employees will allow work preoccupations to distract them from their present sense appreciation that a floor surfaceeven one recently traveledwas in a state of wetness. After a lapse of approximately 12 years since shift lieutenants were informed that cones should be placed, in light of the irregular pattern of placing cones in the Kleinpeter substation, absent the stamp of the Sheriff's authority of such a procedure, we cannot say that this record lacks a reasonable basis to support the trial court's conclusion that the Sheriff was entirelyand Lt. O'Connor was notat fault for failing to direct the trustee to place cones in the hallway where his office was located.
We likewise find no error in the trial court's conclusion that Lt. O'Connor was not at fault for failing to use due care as he traveled down the hallway to answer the ringing phone. Although the Sheriff contends that by proceeding hastily to his office and failing to detect the odor from the cleaning agents in the water used to mop the floors, Lt. O'Connor bears some responsibility for the O'Connor's losses, the trial court concluded to the contrary.
The testimonial evidence addressing the rate of Lt. O'Connor's travel as he headed to his office was disputed. But it was undisputed that Lt. O'Connor was proceeding toward his office motivated by a desire to answer the ringing phone of the Sheriff's substation. No evidence suggests that Lt. O'Connor knew that the floor was wet or had been recently mopped at the time. The record supports a finding that hectic conditions and, hence, hasty motion by the deputies was within the range of activity acceptable at a sheriff substation. Lt. O'Connor was attempting to execute the duties expected of him. And that he did not smell the odor of cleaning agents used in the water does not make it unreasonable for the trial court to have found Lt. O'Connor free from fault either. According to safety expert Frenzel, the odor of the cleaning agents does not serve as a warning of a wet floor, noting that the smell can linger even after the floor has dried. He also pointed out that in light of the substation's configuration, odors *245 from the cleaning agents would permeate the entire area, thereby discounting any localized affect that a person might be more likely to notice. The trial court's conclusion is a reasonable one based on this record, and, therefore, we find no manifest error.

DAMAGES
The trial court awarded the O'Connors $404,894.83 for the survival action. Additionally, the trial court awarded $300,000 to Janice and $200,000 to George for their respective wrongful death damages. The Sheriff challenges these awards.

Collateral Source Rule
The parties stipulated Lt. O'Connor's total medical expenses were $66,916.83. And while the judgment awarded only a lump sum of $404,894.83, in its written reasons, the trial court listed the stipulated medical expenses as an item of damages in the survival action.
Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. Louisiana Dep't of Transp. and Dev. v. Kansas City Southern Ry. Co., 02-2349, p. 6 (La.5/20/03), 846 So.2d 734, 739.
Noting that in his capacity as the deputy lieutenant's employer, he paid the entire health insurance premium, the Sheriff asserts that the trial court erred by its application of the collateral source rule, which resulted in its failure to allow a credit in favor of the Sheriff for the medical expenses made by Lt. O'Connor's health insurance provider. The Sheriff reasons that having been determined to be the tortfeasor in this case and as the source of the insurance which resulted in payments to medical providers, the awarded medical expenses are not monies received from sources "independent of the tortfeasor's procuration or contribution." By awarding Lt. O'Connor's medical expenses in tort, the Sheriff urges that the O'Connors have received a second recovery from him.
The collateral source rule is of common law origin yet it is well-established in the jurisprudence of this state. Kansas City Southern Ry. Co., 02-2349 at p. 6, 846 So.2d at 739. According to Restatement (Second) of Torts § 920A (1979):
(1) A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability.
(2) Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.
Thus, a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor, and if the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. See Restatement (Second) of Torts § 920A comment b. See also Coscino v. Wolfley, 96-0702, p. 12 (La.App. 4th Cir.6/4/97), 696 So.2d 257, 264, writs denied, 97-2317, 97-2539 (La.1/9/98), 705 So.2d 1100, 1102 (declining to credit a state agency tortfeasor for health provider paid medical expenses to state employee victim).
The record clearly establishes that the payment of Lt. O'Connor's entire health premium was an arrangement made as a result of his employment contract with the Sheriff. As such, the deputy lieutenant *246 negotiated an advantageous term in his employment arrangements with the Sheriff for which the collateral source rule applies in favor of Lt. O'Connor. Simply stated, the trial court correctly found the Sheriff is not entitled to a credit for any medical expenses paid by his health insurance provider.

Statutory Cap
The parties do not dispute the applicability of La. R.S. 13:5106 B, which limits the liability imposed on the State, a State agency, or public subdivisions, stating in relevant part:
B. (1) In all suits for personal injury to any one person, the total amount recoverable, including all derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars.
(2) In all suits for wrongful death of any one person, the total amount recoverable, exclusive of property damages, medical care and related benefits and loss of earnings or loss of support, and loss of future support, as provided in this Section, shall not exceed five hundred thousand dollars.
The Sheriff urges that properly interpreted, the awards made under subsection B(1) and B(2) are subject to one cap, which cannot exceed $500,000. Thus, he contends that the trial court's combined survival action and wrongful death awards, totaling $904,894.83 ($404,894.83 + $300,000 + $200,000), should be reduced as a matter of law to $500,000.[7]
The plain reading of the statute provides for one cap on personal injury damages (including survival actions for those personal injury damages) and one cap for wrongful death damages. Barrilleaux v. Barthelemy, 02-1416, p. 6 (La. App. 4th Cir.4/2/03), 844 So.2d 1006, 1010, writ denied, 03-1254 (La.9/5/03), 852 So.2d 1040. Because neither the trial court's award for the survival action nor the combined awards for the wrongful death damages exceed $500,000, there is no error.

Loss of Consortium Damages
In their answer to the Sheriff's appeal, the O'Connors claim entitlement to loss of consortium damages under La. R.S. 13:5106 B(1).[8]
The elements of a spouse's loss of consortium claim include loss of: love and affection; companionship, impairment of sexual relations; material services; support; aid and assistance; and felicity. With the exception of its sexual component, the elements of a child's claim for loss of service and society are essentially the same. Farley v. State Through Dep't of Transp. and Dev., 96-0538, p. 7 (La. App. 1st Cir.9/27/96), 680 So.2d 750, 754, writ denied, 96-2604 (La.12/13/96), 692 So.2d 1065. And while consortium claims are usually limited to those asserted on behalf of minor children, under limited circumstances these damages may be awarded to an adult child. Id.
As noted above, the judgment expressed a lump sum award of $404,894.83 in the survival action. In addition to the award for medical expenses in the amount stipulated *247 by the parties, the written reasons for judgment state:

For the survival action, this [court] awards the following damages:
1. Fractured ... ankle The plaintiff was in a cast for six weeks and
attended physical therapy ... $ 10,000.00
2. Midline herniation of C6-7 cervical disc The plaintiff under went
the following treatments: myelogram, CT scan, surgery, physical
therapy ... $ 80,000.00
3. ALS The plaintiff deteriorated from a robust man of 214 pounds to
a man trapped within his body unable to move, eat, or communicate
weighing only 100 pounds at his death approximately 13 months
later ... [$]250,000.00[.]

The fact finder has great discretion in determining the amount of damages, and appellate courts should rarely disturb such an award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is well settled that a lump sum judgment is presumed to award all items of damages claimed. Bryan v. City of New Orleans, 98-1263, p. 2 (La.1/20/99), 737 So.2d 696, 697-98. The appellant's burden of proving the fact finder clearly abused its great discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable. Id., 98-1263 at p. 3, 737 So.2d at 698.
The O'Connors' sole complaint on appeal is that the trial court's failure to award any consortium claims was manifestly erroneous under the facts of this case. But a careful reading of the trial court's reasons does not support this assertion. Specifically, we note that the trial court's reasons do not expressly limit the amounts itemized for each injury Lt. O'Connor sustained to his general damages. Thus, the trial court's itemization of damages for each injury included all claimed losses, including the O'Connors' respective loss of consortium claims. Indeed, the impact on the lives of both Janice and George was intense, especially during the last six months of Lt. O'Connor's life when he was under the care of hospice. But the trial court's award of $340,000 for Lt. O'Connor's damages as well as for the derivative loss of consortium claims of his wife and adult son did not constitute an abuse of discretion, and the O'Connors are not entitled to additional relief for their derivative claims.
Having found that the collateral source rule was correctly applied in this case, that the awards to the O'Connors for the survival action and wrongful death damages were within the statutory cap set by the legislature in La. R.S. 13:5106, and that the amount of damages awarded to the O'Connors in the survival action, which included their respective loss of consortium claims, was not an abuse of discretion, we find no error in the trial court's awards of damages.

DECREE
The trial court's judgment is affirmed. The answer to appeal filed by the O'Connors is denied. Appeal costs in the amount of $1,661.55 are assessed against *248 Elmer Litchfield in his capacity as the Sheriff of East Baton Rouge Parish.
AFFIRMED.
MCDONALD, J., concurs.
NOTES
[1] According to Dr. Zuckerman, Amyotrophic lateral sclerosis (ALS) is a neurological disorder that once contracted continues to worsen due to the loss of neurons in both the brain and the spinal cord. Dr. Zuckerman explained that ALS creates a progressive weakness and ultimately causes the death of those who have it.
[2] See generally La. C.C. arts. 2315.1 and 2315.2.
[3] It is undisputed in this case that the O'Connors' lawsuit falls within the ambit of the provisions of La. R.S. 23:1034(B), which exempts workers compensation claims by sheriff deputies; these employees are ordinarily prohibited from filing lawsuits in tort for their work-related injuries against their employer. See Jones v. Traylor, 93-2144, p. 1, n. 1 (La. App. 4th Cir.4/28/94), 636 So.2d 1112, 1115 n. 1, writ denied, 94-1337 (La.9/16/94), 642 So.2d 193.
[4] In ordinary slip and fall cases which do not implicate the duties imposed under La. R.S. 23:13, liability is based on theories of either strict liability, see La. C.C. art. 2317, negligence, see La. C.C. art. 2315, or both. Fontenot v. Fontenot, 93-2479, pp. 2-3 (La.4/11/94), 635 So.2d 219, 221.
[5] The Sheriff does not complain of the trial court's implicit finding that the failure to set out the warning cones was the cause-in-fact of Lt. O'Connor's death by ALS. Dr. Zuckerman testified that as an accepted risk associated with ALS, he believed the trauma Lt. O'Connor experienced as a result of his injuries from the slip and fall, especially to his back, "obviously caused spinal damage." This reasonable factual basis duly supports the trial court finding and, thus, it is not manifestly erroneous.
[6] On appeal, the Sheriff asserts that the trial court erred in imposing vicarious liability under La. C.C. art. 2320 against him for the negligence of the trustee who failed to place the warning cones, challenging also the finding that such negligence was the cause-in-fact of the O'Connors damages. Although the trial court's written reasons expressly found "that the [Sheriff] was vicariously liable for failing to properly mark the wet areas with cones, as is the [Sheriff's] stated policy, and that this failure was the cause in fact of the [O'Connors'] injuries," reading the reasons in their entirety does not convince us that this was the sole basis the trial court relied upon to assess "one hundred percent (100%) of the fault and liability" against the Sheriff. Throughout the reasons, the trial court states the various arguments raised by the Sheriff and, addressing each one-by-one, explains why they lack merit ultimately assessing "one hundred percent (100%) of the fault and liability" against the Sheriff. Thus, we believe the reasons have alternative holdings for the trial court's liability conclusion including imposition of liability directly against the Sheriff for his failure to properly disseminate the "housekeeping tasks performed by the trustees," albeit not expressed as clearly as the vicarious liability holding. But even if our construction of the trial court's reasons is faulty, it is the judgmentnot the reasons for judgmentwhich the appellate court reviews. See Huang v. Louisiana State Bd. of Trustees for State Colleges and Universities, 99-2805, pp. 4-5 (La.App. 1st Cir.12/22/00), 781 So.2d 1, 6. And where the Court of Appeal believes that the trial court reached the proper result, the judgment will be affirmed. Id. Because this record supports the imposition of liability directly against the Sheriff under La. R.S. 23:13, a discussion addressing whether the Sheriff can be vicariously liable for the trustee's negligence under the facts of this case is pretermitted. See and compare Bd. of Comm'rs of Orleans Levee Dist. v. Shushan, 197 La. 598, 611, 2 So.2d 35, 40 (1941) (reviewing court decides a case on the issues presented by the pleadings or evidence and not on the argument of counsel in the court below or even on reasons assigned by trial judge, and fact that trial judge decides the case on one of the points at issue does not preclude reviewing court from deciding the case on another point).
[7] The Sheriff also suggests that the statutory cap includes legal interest and costs and, therefore, complains of the trial court's assessment of these items against him. The express provisions of La. R.S. 13:5112 B and C permit these items and, therefore, the trial court's rulings are not erroneous. This assertion by the Sheriff is without merit.
[8] See also La. R.S. 13:5106 D(4) (derivative claims include claims for loss of consortium).