STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1368

ARLENE CHAMBERS

VERSUS

VILLAGE OF MOREAUVILLE

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2008-2551-A
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Oswald A. Decuir, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**AFFIRMED IN PART AS AMENDED, REVERSED IN PART.**

Darrel D. Ryland
Wesley K. Elmer
Attorneys at Law
P. O. Drawer 1469
Marksville, LA 71351
(318) 253-5961
Counsel for Plaintiff/Appellee:
Arlene Chambers

Karen Day White
Louisiana Municipal Association
700 North 10th Street, Suite 440
Baton Rouge, LA 70802
(225) 334-5001
Counsel for Defendant/Appellant:
Village of Moreauville

**GREMILLION, Judge.**

The Village of Moreauville, Louisiana, appeals a judgment in favor of Arlene Chambers finding it 100 percent at fault for Chambers' April 19, 2008 fall on a sidewalk in the Village's care, custody, and control. For the reasons that follow, we affirm in part, as amended, and reverse in part.

**FACTS**

On April 19, 2008, Arlene Chambers and a friend, Annette Bowman, were returning from the Simpson Baptist Church on Tassin Street, where they had attended the funeral of a co-worker, to Chambers' home. The two ladies had ridden to the church with Bowman's husband, but were walking to Chambers' home, where Bowman's car was parked. Prior to this date, Chambers had never walked along this stretch of Tassin Street before. Chambers is a resident of Moreauville, Louisiana, where she had lived for approximately four years. The church is about seven-tenths of a mile from Chambers' home. As she was walking, Chambers tripped on a section of sidewalk and fell.

The particular section of sidewalk at which Chambers fell abuts a driveway. Two sections had become, or were installed, depressed in relation to the rest of the sidewalk[1]. As a result, those two sections sit a few inches lower than the remaining sidewalk. They also tilt slightly toward the street. At the point where this depression ends, the sidewalk abruptly rises again, creating an approximately one-and-one-quarter to one-and-one-half inch immediate elevation change in addition to the elevation change created by the depression. Grass grows in the crack beneath this

---

[1] It is unclear whether the depression of these two sections was intentional. Between the street and the sidewalk a drain has been installed. The driveway at which the two sections are located has been extended and is similarly depressed, as though to shunt effluent toward the drain.

1

elevation change but does not extend across the width of the sidewalk.

Chambers and Bowman were walking abreast on the Tassin Street sidewalk. The weather was fair and the sky sunny. Chambers noted that the sidewalk was uneven, but failed to notice this immediate elevation change that Chambers described as a "ledge." The toe of Chambers' boot caught on this ledge, causing her to fall. She sustained a comminuted fracture of the radius of her right arm.

Because Bowman had to go to Baton Rouge to visit her hospitalized brother, Chambers called another friend, who transported Chambers to Avoyelles Hospital in Marksville, Louisiana. Dr. Paul Fenn, an orthopedic surgeon, placed Chambers in a splint and informed her that her wrist would require surgery. He informed her that he could perform the surgery, or he could refer her to Dr. Diego Miranda, an orthopedic surgeon specializing in hand and wrist injuries. Chambers preferred to see Dr. Miranda.

Chambers' surgery was performed at Rapides Regional Medical Center in Alexandria, Louisiana, on April 28, 2008. Dr. Miranda performed an open reduction of the fracture and installed two plates to affix the fracture. The surgery was performed with no adverse reactions on Chambers' part. Dr. Miranda saw Chambers for a few follow-up visits, then referred her to Dr. Douglas Gamburg, an orthopedic surgeon within the same clinic, because Dr. Miranda was relocating his practice.

Following surgery, Chambers was referred for physical therapy with Brenda Wood of The Therapy Center of Avoyelles in Marksville. The physical therapy records demonstrate steady progress on Chamber's part. According to Wood's records, she felt that Chambers had achieved the maximum benefits from therapy, and recommended that she be discharged from therapy on August 15, 2008.

2

In October 2008, Chambers returned to Dr. Gamburg complaining of pain and limited range of motion in her right shoulder. At that time, Chambers related this shoulder pain to her fall in April. Dr. Gamburg referred Chambers for an MRI of the shoulder. That MRI, taken on October 22, 2008, demonstrated some degenerative changes in the shoulder but no evidence of any rotator cuff tear. Dr. Gamburg returned Chambers to physical therapy. Chambers resumed physical therapy on October 28. By November 18, she had achieved all short and long term goals of therapy and appeared ready for discharge to home exercises.

In March 2009, Chambers experienced more problems with her shoulder and returned to Dr. Gamburg. Dr. Gamburg returned Chambers to physical therapy. Again, after about a month, Chambers' shoulder had progressed to the point that it was felt that she could adequately control her condition through home exercises and she was discharged from therapy.

Chambers returned to Dr. Gamburg in October 2009 with complaints in both the wrist and shoulder. Dr. Gamburg gave Chambers' shoulder an injection of Depo-Medrol and Marcaine. He also ordered that she undergo nerve conduction studies of the right median and ulnar nerves, which demonstrated no evidence of carpal tunnel syndrome. By February 2010, Chambers was beginning to experience pain in her left shoulder, which Dr. Gamburg felt were related to the fact that her right shoulder problems were restricting her movements. Dr. Gamburg diagnosed this condition as adhesive capsulitis. He also determined that Chambers had developed inflammatory palmar fasciitis in her right hand. Dr. Gamburg ordered Chambers to undergo a functional capacity evaluation (FCE) that was performed by Alexandria physical therapist, Eugene Noel. The FCE demonstrated that Chambers had limitations in both

3

shoulders and her right wrist. However, the limitations in Chambers' left shoulder were, according to Mr. Noel, considerable. Her right wrist demonstrated limited motion but her hand strength was above normal. Her frequent lifting capacity was rated as "medium," as defined by the U.S. Department of Labor physical demand limit. Control tests built into the test showed that Chambers was exerting maximal effort on almost every task.

Dr. Gamburg noted in his testimony that he could find no notation in the records from Drs. Fenn or Miranda to corroborate Chambers' claim that her right shoulder had caused her problems from the date of the accident until he first saw her. However, he testified that, assuming her complaints had been present from that date, he would relate her right shoulder complaints to the April 2008 fall. Although he found no evidence of a trauma to the right shoulder, Dr. Gamburg felt that the prolonged immobility of the shoulder necessitated by the right wrist injury caused Chambers to develop problems with the shoulder. Dr. Gamburg testified that Chambers will always have permanent stiffness in her wrist, and will have occasional pain in her shoulder that may necessitate physical therapy in the future. He did not foresee any future treatment for Chambers' wrist, and her shoulder can be treated with anti-inflammatory medication, probably Ultram.

Chambers filed suit against the Village in September 2009, and a bench trial was conducted on August 4, 2010. At trial, plaintiff testified, and called Linda Neland, former Human Resources Manager of the Avoyelles Correctional Center; Vickie Dufour, a friend who testified to the extent of Chambers' difficulties from her injuries; and Philip Beard, a civil engineer who testified as an expert. She introduced the depositions of Dr. Gamburg, Mr. Noel, and Dr. G. Randolph Rice, an economist.

4

Chambers also introduced a report from Dr. Richard Galloway, a vocational rehabilitation expert.

The trial court took the matter under advisement and gave oral reasons in support of its ruling in favor of Chambers on August 11, 2010, during a conference call held on the record with counsel. The trial court found the Village 100 percent at fault and awarded Chambers the following damages: $200,000.00 for past and future pain and suffering; $25,000.00 in hedonic damages; $54,148.00 in future wage loss; $46,616.17 in past medical expenses; $10,000.00 in future medical expenses; and $3,617.34 in past wage loss. The Village was also ordered to pay all court costs, including Chambers' expert witness fees. A judgment comporting with the trial court's oral reasons was signed and the Village now appeals.

### ASSIGNMENTS OF ERROR

The Village urges that the trial court committed the following errors:

I.  The trial court erred in finding that the elevation differential in the sidewalk presented an unreasonable risk of harm in accordance with La.R.S. 9:2800 and Louisiana jurisprudence.

II. The trial court erred in finding that the Village of Moreauville is 100 percent liable for Ms. Chambers' tumble when the uncontradicted facts established at trial clearly show that plaintiff must bear a percentage of fault, if not all fault, for the accident and the ensuing damages.

III. The trial court erred in awarding plaintiff money for future lost wages when there is absolutely no documentary or testimonial evidence to support such an award.

IV. The trial court erred in awarding plaintiff money for future medical expenses when there is absolutely no documentary or testimonial evidence to support such an award.

V.  The trial court abused its discretion in awarding plaintiff $200,000 in general damages /pain and suffering for her injury.

5

VI.     The trial court abused its discretion in awarding plaintiff $25,000 as an award for loss of enjoyment of life.

**ANALYSIS**

*Liability of the Village*

Liability for defects in premises is generally founded upon Louisiana Civil Code articles 2317, 2317.1, and 2322. When a public entity is involved, that liability is also governed by La.R.S. 9:2800, which provides that when liability is premised upon La.Civ. Code art. 2317, the public entity must have either actual or constructive knowledge of the defect and had a reasonable opportunity to remedy it. A "defect" for purposes of article 2317 can be described as any "risk-creating harm." *Loescher v. Parr*, 325 So.2d 441, 446 (La.1975). Only when risk-creating harm poses an unreasonable risk does liability attach. *Entrevia v. Hood*, 427 So.2d 1146 (La.1983); *Celestine v. Union Oil of Cal.*, 94-1868 (La. 4/10/95), 652 So.2d 1299.

Cases involving litigation against municipalities over sidewalk defects are legion. The courts are supplied with ample guidance in determining a municipality's liability for sidewalk defects. The Louisiana Supreme Court long ago stated:

> [T]here have evolved certain legal principles which are to be considered in determining the instant controversy. Thus, a municipality is not an insurer of the safety of pedestrians. It must keep the sidewalks reasonably safe, but the maintaining of them in perfect condition is not necessary. To render it liable in damages the defect complained of must be dangerous or calculated to cause injury. Defects in sidewalks that are not in the nature of traps, or from which danger cannot reasonably be anticipated, provide no actionable negligence. Such ways of passage are intended for public use, of course, and a pedestrian is entitled to assume that they are not dangerous. Further, he is not required to constantly observe the surface of the walk or to exercise the care that would be necessary in traversing a jungle. However, he cannot be completely oblivious of its condition; he must exercise ordinary care when using it, having in mind the well recognized fact that throughout every city of any size in this state there exist irregularities in the walkways brought about by natural causes such as rains, expansion, soil erosion and tree roots.

6

*White v. City of Alexandria*, 216 La. 308, 314-15, 43 So.2d 618, 620 (1949). The determination of whether a defect creates an unreasonable risk of harm involves weighing the social value and utility of the thing against the potential harm to others. *Reed v. Wal-Mart Stores, Inc.*, 97-1174 (La. 3/4/98), 708 So.2d 362. As the supreme court has also stated:

> There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. To assist the trier-of-facts, we note that many factors are to be considered and weighed, including: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved.

*Dupree v. City of New Orleans*, 99-3651, p. 14 (La. 8/31/00), 765 So. 2d 1002, 1012.

Because a pedestrian is obligated to observe his path mindful that every sidewalk contains irregularities, per *White*, 43 So.2d 618, a condition that is obvious and easily avoidable cannot be considered to present an unreasonable risk of harm. *Alexander v. City of Baton Rouge*, 98-1293 (La.App. 1 Cir. 6/25/99), 739 So.2d 262, *writ denied*, 99-2205 (La. 11/5/99), 750 So.2d 188. *See also, Godwin v. City of Alexandria*, 07-1576 (La.App. 3 Cir. 5/28/08), an unpublished opinion.

Chambers' expert, Philip Beard, was asked about whether the condition of the sidewalk was obvious. He stated, "There is probably twenty-five to thirty areas that she would have had to negotiate to ever get to this one. Those things tend to low (*sic*) you to sleep and will bite you when you let your guard down. I think that is exactly what happened here." However, Beard also admitted that his examination of the site between the church and the area of the accident revealed at least twelve areas that were in need of repair. Indeed, the sidewalk is not continuous as demonstrated by the photographs in evidence, nor does it follow a straight course. There are numerous

7

deviations and some appear greater than that at the site of the accident.

The evidence demonstrates that, other than Chambers, no person has complained of the condition of the sidewalk at this location. However, the location of the accident was at the edge of the home of Moreauville's mayor, Lionel Bordelon, who testified that the condition had changed very little since 1968 when he moved into the house. According to the mayor, at least 25 pedestrians a day pass this area. Chambers' is the first incident of its kind at this location.

The trial court's finding that this defect presented an unreasonable risk of harm is reviewed under the manifest error standard. *Baker v. State Dep't. of Health and Human Resources*, 05-808 (La.App. 3 Cir. 2/1/06), 921 So.2d 1209. The supreme court has instructed us that such findings may be reversed only when we find that a reasonable basis does not exist in the record for the finding and that the finding is clearly wrong. *Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). Even if we are convinced that had we been siting as the triers of fact we would have decided the matter differently, we may not reverse if the fact-finder's conclusions are reasonable in light of the record as a whole. *Stobart v. State through Dep't. of Transp. and Dev.*, 617 So.2d 880 (La.1993); *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106 (La.1990).

We conclude that a reasonable basis for the trial court's conclusion that this condition represents an unreasonable risk is supported by the record. The deviation in height was significant. The fact that it occurred immediately after Chambers had to negotiate a downward slope followed by an upward slope made the deviation more difficult to negotiate. The finding that this deviation represented an unreasonable risk of harm is not manifestly erroneous.

*Comparative fault*

The finding that the Village was 100percent at fault is also reviewed under the manifest error standard. *Layssard v. State, Dep't. of Public Safety and Corr.*, 07-78 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, *writ denied*, 07-1821 (La. 11/9/07), 967 So.2d 511. The allocation of fault is not an exact science but is the search for an acceptable range that could reasonably be assessed to each party. *Id.* Thus, if the court of appeal finds that the trial court erred, the percentages allocated by the trial court can only be adjusted to reflect the highest percentage assessed the Village and the lowest percentage that could be assessed Chambers. *Clement v. Frey*, 95-1119 (La. 1/16/96), 666 So.2d 607.

The record in this matter does not reasonably support a finding that Chambers is free from fault. Chambers' own expert determined that Chambers had probably been lulled into inattention. Chambers professed awareness that sidewalks in the Village were prone to imperfections. She was also aware that the sidewalk dipped or sagged significantly in that area and canted toward the street. Had Chambers looked down as she negotiated this depression, she surely should have seen the tufts of grass growing in the crack at the base of the "ledge." She testified that she looked down to negotiate the depression, but she and Bowman were talking as they walked, so her attention was diverted.

The trial court essentially ignored these factors and the duty Chambers owed herself to "exercise ordinary care when using [the sidewalk], having in mind the well recognized fact that throughout every city of any size in this state there exist irregularities in the walkways brought about by natural causes such as rains, expansion, soil erosion and tree roots." *White*, 216 La. at 315, 43 So.2d at 620.

Instead, the trial court focused almost exclusively on the fact that the Village had not repaired the defect because of the cost, the amount of which was very much disputed.

We find that the highest amount the trial court could have assessed the Village is 90 percent. Conversely, the lowest amount it could have reasonably assessed Chambers is 10 percent. The judgment is amended to reflect an allocation of fault in these amounts.

*Award of future wage loss*

At the time of this accident, Chambers was employed full-time at the Avoyelles Correctional Center as a corrections sergeant. She is still employed there. The facility is a correctional center housing male offenders. Chambers is required to directly interact with the male offenders at the facility and to intervene personally if an altercation erupts. The former Human Resources Manager for the center, Linda Neland, agreed that Chambers was "at high risk for termination." However, this high risk for termination was based upon the fact that the state corrections facilities are facing budget constriction and the possibility of privatization. *If* Chambers is unable to perform her job tasks—and the testimony demonstrates that as of trial she was performing adequately—and *if* budget constriction or privatization force a change in circumstances, her job *might* be in jeopardy. Juxtaposed to this speculation is the recorded fact that since the accident occurred, Chambers has received a merit pay increase.

Chambers introduced the report of Dr. Richard H. Galloway, an expert in vocational rehabilitation. Dr. Galloway opined that Chambers' job at the center is classified as medium duty. The FCE demonstrated that Chambers was capable of medium duty work. Dr. Galloway did not opine regarding the probability that

10

Chambers would be unable to perform her responsibilities, but did opine that her upper extremity limitations, coupled with her academic limitations, would hamper Chambers' ability to earn her current wages should she enter the employment market. We also note that since this accident, Chambers has received a promotion.

A plaintiff claiming a loss of future earnings must prove that loss by a preponderance of the evidence. *Jordan v. Travelers Ins. Co.*, 257 La. 995, 245 So.2d 151 (1971). A finding that a plaintiff is entitled to damages for loss of future earnings is reviewed under the manifest error standard. *Ryan v. Zurich American Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214. Such an award may not be based upon speculation, probabilities, or conjecture. We have long held that such an award is susceptible of mathematical calculation and is thus not afforded the deference reserved for general damage awards. *Ammons v. St. Paul Fire & Marine Ins. Co.*, 525 So.2d 60, *writ denied*, 525 So.2d 1045 (1988).

The trial court heard the testimony of Dr. G. Randolph Rice, an economist, on his valuation of Chambers' loss of future earnings. Dr. Rice testified that Chambers was 61 years old, and would thus have a work life expectancy of 4.18 years from the date of trial. She earns $31,838.20 per year at the Avoyelles Correctional Center. Assuming 2.5 percent annual raises and after applying a three-percent discount rate to the annual salary for the 4.18 years, Chambers had a loss of future earnings from that employment of $131,419.00. Chambers also held a part-time job with the Lucky Rose Casino, a video gaming establishment in Simmesport, Louisiana. That job paid Chambers $7.50 per hour. Dr. Rice opined a loss of future earnings for this employment of $31,889.00. These figures, though, represent what Chambers would lose if she were unable to work after the trial date. If Chambers lost her job at the

11

correctional center on the date of trial and was able to procure employment at only $9.00 per hour, her loss would total $86,037.00. Dr. Rice opined that, had Chambers voluntarily terminated her employment with the Lucky Rose, then hypothetically lost her job with the correctional center, her loss of future earnings, assuming re-employment at $9.00 per hour, would be $54,148.00. This was the amount the trial court awarded.

The difficulty presented by the award here is that the record is devoid of evidence that Chambers more probably than not would lose her job with the center due to her injuries. Indeed, she received a merit promotion and pay raise after the accident. She missed relatively little work considering the complexity and severity of her injury. An award of loss of future earnings in this instance is simply too speculative and is manifestly erroneous.

*Future medical expenses*

Dr. Gamburg addressed Chambers' need for future medical treatment. He opined that Chambers was probably going to have problems with her right shoulder in the future. She also will be prone to develop arthritis in her right wrist. However, he felt these could be controlled with anti-inflammatory medication such as Ultram. He felt that Chambers' worst-case scenario would be the development of intractable pain in the wrist, which would necessitate a fusion. He characterized this as only a possibility. He did not feel that Chambers would be in need of future diagnostic testing such as x-rays. However, should her shoulder problems recur, Chambers would require physical therapy as she had in the past. Other than Ultram and physical therapy, Dr. Gamburg foresaw no other future medical treatment Chambers might require.

12

Between her first complaint of shoulder pain in October 2008 and trial in August 2010, Chambers underwent three separate courses of physical therapy for her right shoulder.

The Village complains of the trial court's award of future medical expenses on the basis that the evidence does not support such an award. If a plaintiff proves the necessity of future medical treatment and the reviewing court "can examine the record and determine from past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required," an award of future medical expenses should not be rejected. *Stiles v. K-Mart Corp.*, 597 So.2d 1012, 1013 (La.1992).

Chambers demonstrated through the course of these events that when medical treatment is warranted, she seeks that treatment. Dr. Gamburg testified that Chambers may require future medical treatment in the form of prescription anti-inflammatory agents and physical therapy. The trial court felt Chambers had established the need for future medical care. We find no manifest error in this finding.

Chambers established her past medical expenses through the introduction of her bills. Dr. Gamburg charged Chambers between $75.00 and $162.00 per visit. Chambers saw him four times in 2009 for a total of $462.00. The Therapy Center of Avoyelles charged Chambers $2,125.00 for the one course of twelve treatments it rendered her in 2009. Based upon the history of Chambers' treatment and the costs associated therewith, we cannot conclude that the $10,000.00 in future medical expenses awarded by the trial court does not represent the minimum amount on which reasonable minds could agree. The trial court's award of future medical expenses to be placed into a reversionary trust is affirmed.

13

*General and hedonic damages*

The Village complains that the general damages and the hedonic damages (loss of enjoyment of life) were abusively high. Before this court can disturb an award made by the trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. *Wattigny v. Breaux,* 488 So.2d 419 (La.App. 3 Cir.1986); *Perniciaro v. Brinch,* 384 So.2d 392 (La.1980); *Coco v. Winston Industries, Inc.,* 341 So.2d 332 (La.1976). In reviewing an award of damages to determine whether it is inadequate or excessive, the appellate court must first look to the individual circumstances of the case before it. *Broussard v. Peltier,* 479 So.2d 679 (La.App. 3 Cir.1985). Only after an analysis of the facts reveals an abuse of discretion can the appellate court disturb the award, and then only to raise inadequate awards to the lowest amount the trial court could have reasonably awarded, or lower excessive awards to the highest amount the trial court could have reasonably awarded. *Reck v. Stevens,* 373 So.2d 498 (La.1979); *Coco,* 341 So.2d 332*; Clark v. State Farm Ins. Co.,* 520 So.2d 860 (La.App. 3 Cir.1987); *Freeman v. Harold Dickey Transport, Inc.,* 467 So.2d 194 (La.App. 3 Cir.1985).

A trial court has abused its discretion when an articulated analysis of the facts demonstrates that the award is clearly beyond the amount a reasonable trier of fact could assess. *Youn v. Maritime Overseas Corp.*, 623 So2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). A review of jurisprudence in similar situations is only useful once it has been determined that the trial court abused its vast discretion. *Id.* In the present matter, Chambers sustained a comminuted fracture of the wrist that necessitated the surgical installation of two plates, which are held in place by ten screws. These plates will not be removed. As a result of the injury,

Chambers had a 22 percent impairment of her right arm according to the testing in the FCE. She had a 13 percent whole-body impairment based on that same testing. Not only did Chambers sustain the right wrist injury, but also injured her right shoulder, which necessitated treatment on three separate occasions over the course of many months. Chambers was forced to immobilize her right arm, which resulted in the impairment of her left shoulder as well.

Based upon these facts, we are unable to conclude that an award of $200,000.00 is clearly beyond what a reasonable trier of fact could assess. We affirm that award.

It is well settled that hedonic damages constitute a compensable element of general damages distinct from pain and suffering. *McGee v. A C And S, Inc.*, 05-1036 (La. 7/10/06), 933 So.2d 770. "Loss of enjoyment of life . . . refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury." *Id.* at 775. The testimony demonstrated that following the accident, Chambers' activities outside her employment were diminished to an appreciable degree. Before the accident, Chambers enjoyed yard work. Her friend, Vickie Dufour, testified that since the accident, the beauty of Chambers' yard has degraded. Chambers no longer engages in canning and preserving fruit and vegetables as she formerly did because of her wrist limitations. Chambers used to play pokeno with Dufour and others, but finds that difficult because she lacks the dexterity required to shuffle and deal the cards. Also, Chambers, Dufour, and some friends would gamble at the casino. Because of her wrist and shoulder pain, Chambers has difficulty engaging in that activity.

15

On the other hand, surveillance video captured by an investigator, Rodney Perro, does demonstrate Chambers engaged in many activities of daily living that involve her right wrist and arm, including screwing shut the gas cap on her car, lifting items, and driving her car.

Taken as a whole, the record supports an award of $25,000.00 for the hedonic component of Chambers' general damages. While the award is somewhat high, it is not so high that we could conclude that it is beyond what a reasonable trier of fact could assess.

## CONCLUSION

The trial court's determination that the sidewalk defect represented an unreasonable risk of harm is subject to a manifest error standard of review. The same standard applies to the trial court's determination that Chambers was without fault in the accident. We find no manifest error in the finding that the sidewalk represented an unreasonable risk of harm. However, we do find manifest error in its determination that the Village was 100 percent at fault, and amend the judgment to assess the Village with 90 percent fault and Chambers with 10 percent fault.

The amount of awards of future medical expenses, loss of future earnings, and general damages, including hedonic damages, are reviewed to determine whether the trial court abused its discretion. We find the trial court did not abuse its discretion in awarding Chambers future medical expenses or in the amount it awarded. Nor do we find an abuse of the trial court's discretion in its award of any component of general damages. The trial court did manifestly err in awarding Chambers an amount for loss of future earnings, as we find that she failed to prove any loss. That portion of the judgment is reversed.

16

All costs of this appeal, in the amount of $132.50, are taxed to Defendant/Appellant, Village of Moreauville.

**AFFIRMED IN PART AS AMENDED, REVERSED IN PART.**